OPINION *Page 2 
{¶ 1} The defendant-appellant, Christopher L. Gibson, appeals the judgment of the Allen County Common Pleas Court convicting him of murder and a firearms specification following a jury trial.
 {¶ 2} On December 15, 2005, the Allen County Grand Jury indicted Gibson on one count of murder with a firearms specification, violations of R.C. 2903.02(A) and 2941.145(A). The indictment resulted from the fatal shooting of George Webb in front of the Bali Hai Lounge[1] in Lima, Ohio shortly after 2:00 a.m. on October 8, 2005. At arraignment, Gibson pled not guilty, and the case proceeded to jury trial on July 31, August 1, and August 2, 2006. The jury found Gibson guilty on both charges and the trial court immediately imposed sentence, ordering Gibson to serve a mandatory, indefinite prison term of 15 years to life for murder and a mandatory prison term of three years for the firearms specification; an aggregate sentence of 18 years to life. Gibson appeals the judgment of the trial court, asserting two assignments of error.
 First Assignment of Error The trial court abused its discretion in denying the mtoion [sic] fora mistrial. *Page 3 
 Second Assignment of Error The jury verdict is against the manifest weight of the evidence and isnot supported by sufficient evidence.
 {¶ 3} In the first assignment of error, Gibson contends that the trial court erred in failing to grant his motion for a mistrial. Gibson contends that he filed three motions to compel discovery; that the court ordered the state to produce DNA reports and any other reports; and that the state told the court it had provided discovery as ordered. Gibson essentially argues he was denied due process by the state's failure to disclose evidence. Specifically, Gibson contends that the state failed to disclose a DNA report prepared in January 2006 and the cell phone records, which the police used to locate him in Georgia.
 {¶ 4} A mistrial is required "`"`only when the ends of justice so require and a fair trial is no longer possible.'"'" State v. Welch, 3d Dist. No. 16-16-02, 2006-Ohio-6684, at ¶ 9, quoting State v.Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 131, quoting State v. Brinkley, 105 Ohio St.3d 231, 2005-Ohio-1507,824 N.E.2d 959, at ¶ 105, quoting State v. Garner, 74 Ohio St.3d 49, 59,1995-Ohio-168, 656 N.E.2d 623. Because "`the trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial[,]'" the court's decision will not be disturbed on appeal *Page 4 
absent an abuse of discretion. State v. Ahmed, 103 Ohio St.3d 27,2004-Ohio-4190, 813 N.E.2d 637, at ¶ 92, quoting State v. Glover (1988),35 Ohio St.3d 18, 19, 517 N.E.2d 900; citing State v. Brown,100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 42; State v. Williams,73 Ohio St.3d 153, 167, 1995-Ohio-275, 652 N.E.2d 721. An "`abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144
(internal citations omitted).
 {¶ 5} The United States Supreme Court has held that a prosecutor "is obligated to disclose all material evidence favorable to the defense on the issue of guilt or punishment." State v. Jackson, 107 Ohio St.3d 53,2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 129, citing Brady v. Maryland
(1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 ("[T]he suppression of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). "`[Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine *Page 5 
confidence in the outcome.'" Jackson, at ¶ 129, quoting United States v.Bagley (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481.
 {¶ 6} In Jackson, the defendant challenged the prosecutor's failure to provide the photo array used in the photograph line-up. The court noted that the photo array was not material because five witnesses had testified that they knew the defendant before the crime, and each witness identified the defendant as one of the shooters. Id. at ¶ 130.
 {¶ 7} In this case, the police recovered several blood samples from the sidewalk near the murder weapon. Gibson challenges the state's failure to provide the DNA report, which was completed in January 2006, because it excluded him as the person whose blood was found on the sidewalk. As we note below in considering the manifest weight of the evidence, the DNA report for the blood droplets constitutes circumstantial evidence, which shows only that Gibson did not bleed on the sidewalk. The blood samples were collected from a public sidewalk in downtown Lima near a bar. In addition, the blood was dry so that the identification officer had to use a damp swab to recover samples. The direct evidence consisted of several witnesses stating that they knew Gibson for significant lengths of time prior to the shooting, identifying him as the shooter, and describing how the victim was shot (which testimony was confirmed by the coroner's report and testimony). The DNA report can also be overcome by other *Page 6 
circumstantial evidence. For instance, forensic testing identified Gibson's right palm print on the back strap of a gun, which ballistic testing confirmed was the murder weapon.
 {¶ 8} We also note that the state had provided Gibson with a DNA report, which was dated in February 2006. The February DNA report showed the results of the DNA testing performed on the handgun and indicated that it was a supplemental report. During discovery, the trial court ordered that all DNA reports be disclosed. At a subsequent show cause hearing held on March 8, 2006, the state told the court it had provided all discovery items to the defense, and defense counsel affirmed that representation. The record indicates that at the time of the show cause hearing, the February DNA report, which specifically stated it was a supplement, had been disclosed to Gibson. However, Gibson failed to object about the state's failure to disclose the January DNA report until during trial. The state concedes it erred in not providing the report; however, we cannot find reversible error on this record.
 {¶ 9} Gibson also challenges the state's failure to provide the affidavit, warrant, and pin records for his cell phone. At trial, defense counsel indicated that he had requested phone records on several occasions, and the state had told him there were none, they were not available, or they were not discoverable. *Page 7 
 {¶ 10} Immediately following the shooting, the police received many anonymous phone calls identifying "Christopher Gibson," "Christopher Smalls," or "Smalls" as the shooter.[2] The police were unable to locate Gibson in Lima and received a tip that he had gone to Georgia or Alabama. On that information, the police obtained records for a cell phone purchased by "Christopher Smalls" in Columbus, Ohio. The records contained phone calls made from Georgia, which is where the police located Gibson.
 {¶ 11} Once disclosed during trial, the court allowed defense counsel to review the phone records over night in preparation for cross-examination. On cross-examination, counsel did not address any issues relating to the phone records. Even if the records had been disclosed earlier, they would not have affected the outcome of trial. The police had identified Gibson by his given name and by his street name, and they had information about his possible whereabouts after the shooting. The phone records were not marked as an exhibit and were not admitted into evidence. The phone records were discussed only in relation to how Gibson was located in Georgia. In light of the other evidence in this case, the state's failure to disclose the phone records prior to trial does not undermine the outcome of the trial. *Page 8 
 {¶ 12} Discovery in criminal cases is also governed by Crim.R. 16. In this case, the DNA report and the phone records were subject to discovery under Crim.R. 16(B)(1). However, "Crim.R. 16(E) grants the trial court wide discretion in determining sanctions for discovery violations." State v. Engle, 166 Ohio App.3d 262, 2006-Ohio-1884,850 N.E.2d 123, citing State v. Parson (1983), 6 Ohio St.3d 442, 445,453 N.E.2d 689; State v. Decker, 3d Dist. No. 13-03-17, 2003-Ohio-4645, ¶ 20, citing State v. Myers, 97 Ohio St.3d 335, 2002-Ohio-6658,780 N.E.2d 186, at ¶ 75. Therefore, absent an abuse of discretion, we will not reverse a trial court's sanction for a discovery violation. Id., citing Parson, at 445.
 {¶ 13} In determining the appropriate sanction for a discovery violation, the trial court must inquire into the circumstances and "`must impose the least severe sanction that is consistent with the purpose of the rules of discovery.'" Id. at ¶ 8, quoting Lakewood v.Papadelis (1987), 32 Ohio St.3d 1, 511 N.E.2d 1138, at paragraph two of the syllabus. "The purpose of [discovery] is to prevent surprise and the secreting of evidence favorable to one party; `the overall purpose is to produce a fair trial.'" Id., citing Lakewood, at 3.
 {¶ 14} When the January DNA report was disclosed, the court gave defense counsel a recess to review the document. Following the recess, counsel stated he was not seeking a sanction against the state. He indicated that the defense and the prosecution agreed to remedy the situation by allowing a defense expert to review *Page 9 
the report. He also indicated that the state had agreed to make the DNA examiner, Officer David Hammond, and Detective Scott Leland available to testify the following day since Gibson had not issued subpoenas for those individuals. The state told the court it had not disclosed the report because it did not intend to use the report in evidence and because the state did not find it to be exculpatory. This representation indicates that the non-disclose was willful even if there was no bad faith. However, the trial court inquired into the circumstances, and we cannot hold that the court abused its discretion.
 {¶ 15} We also cannot find an abuse of discretion in the court's remedy concerning the phone records since, as noted above, the trial court gave defense counsel an entire evening to review the phone records, and counsel had the opportunity to cross-examine the witness on that evidence. We again note that the court should impose the least severe remedy for a violation of the discovery rules. In this case, the severe remedy of a mistrial was not required, and the trial court did not abuse its discretion in denying Gibson's motion. The first assignment of error is overruled.
 {¶ 16} In the second assignment of error, Gibson contends the state presented insufficient evidence, or in the alternative, if the evidence was sufficient, the jury's verdict was against the manifest weight of the evidence. The state *Page 10 
responds, arguing that the evidence was sufficient and that the verdict was supported by the weight of the evidence.
 {¶ 17} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541. Sufficiency of the evidence is a test of adequacy, used to "`determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" Id., quoting Black's Law Dictionary (6 Ed. 1990) 1433; citing Crim.R. 29(A); State v. Robinson (1955), 162 Ohio St. 486, 124 N.E.2d 148. A conviction based on insufficient evidence constitutes a denial of due process, and the defendant may not be recharged for the offense. Id. at 386-387, citing Tibbs v. Florida (1982), 457 U.S. 31, 45,102 S.Ct. 2211, 72 L.Ed.2d 652, citing Jackson v. Virginia (1979), 443 U.S. 307,99 S.Ct. 2781, 61 L.Ed.2d 560.
 {¶ 18} To preserve an appeal based on the sufficiency of the evidence, a defendant must make a motion for acquittal pursuant to Crim.R. 29 after the state rests. State v. Dinkins, 3d Dist. No. 1-06-50,2007-Ohio-1917, at ¶ 26. If that motion is overruled and the defendant presents evidence, the defendant must renew the Crim.R. 29 motion at the close of all evidence. Failure to do so constitutes a failure to preserve the defendant's appellate rights as to the sufficiency of the evidence. Id., citing Helmick v. Republic-Franklin Ins. Co. *Page 11 
(1998), 39 Ohio St.3d 71, 529 N.E.2d 464, paragraph one of the syllabus;Dayton v. Rogers (1979), 60 Ohio St.2d 162, 163, 398 N.E.2d 781, overruled on other grounds by State v. Lazzaro, 76 Ohio St.3d 261,1996-Ohio-397, 667 N.E.2d 384, syllabus; State v. McElroy, 3d Dist. No. 2-2000-29, 2001-Ohio-2113.
 {¶ 19} At the close of the state's case, Gibson made a motion for acquittal, which the trial court overruled. Gibson then presented evidence in his case, and the state presented rebuttal evidence. However, Gibson failed to renew his motion for acquittal after the state's rebuttal. Accordingly, Gibson has failed to preserve the issue of sufficiency for appellate review, except for plain error.
 {¶ 20} Unlike sufficiency of the evidence, a challenge based on the manifest weight of the evidence requires the court to sit "as a "`thirteenth juror.'" Thompkins, quoting Tibbs, at 42.
 Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.)
Id. at 377, quoting Black's Law Dictionary (6 Ed. 1990), at 1594. When an appellant challenges a conviction based on the weight of the evidence, the court must review the entire record, weigh the evidence and "all reasonable inferences," *Page 12 
consider witness credibility, and determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. To reverse a conviction based on the manifest weight of the evidence, a unanimous panel of three appellate judges must concur. State v.Michaels, 3d Dist. No. 13-99-41, 1999-Ohio-958, citingThompkins, at 389. Under this standard, we must determine whether Gibson's convictions for murder and a firearms specification are supported by the weight of the evidence.
 {¶ 21} To get a conviction for murder, the state must prove beyond a reasonable doubt that the defendant purposely caused the death of another. R.C. 2903.02(A); State v. Rhodes (1992), 63 Ohio St.3d 613,627-628, 590 N.E.2d 261. To get a conviction for a firearms specification, the state must prove beyond a reasonable doubt that a firearm existed and that it was operable at the time of the offense. R.C. 2941.145(A); State v. Murphy (1990), 49 Ohio St.3d 206, 208,551 N.E.2d 932.
 {¶ 22} In its case in chief, the state presented evidence from 14 witnesses and moved 36 exhibits into evidence. The state's first witness was Matthew Rumer, a deputy with the Allen County Sheriffs Department. Rumer testified that on October 8, 2005, he was operating a marked sheriffs sport utility vehicle southbound on West Street. (Trial Tr., Jan. 2, 2007, at 212-213). He stated that he *Page 13 
was stopped at the traffic light at the intersection of West Street and High Street when he heard four or five gun shots and saw people running in a westerly, or south-westerly direction, toward the vehicle. (Id. at 213; 222). Rumer testified that he activated his emergency lights and turned left (east) onto High Street, stopping a short distance from the intersection in front of the Bali Hai Lounge. (Id. at 213). Rumer stated that the victim, George Webb, was lying on the sidewalk, gasping for air, and was unable to communicate. (Id.). Rumer stated that he immediately began to engage in crowd control as there were approximately 75-125 people around the scene. (Id. at 219).
 {¶ 23} Tim Goedde, an officer with the Lima Police Department, testified that he was parked near the Lima Public Library on High Street when he was dispatched to the Bali Hai Lounge due to a possible shooting. (Id. at 228). Goedde testified that there were approximately 75-100 people near the scene and that he began crowd control, securing the crime scene, and talking with people. (Id. at 230-234). Goedde later stated that were approximately 25-30 people who tried to remain near Webb, and he had to arrest one man for disorderly conduct. (Id. at 235; 240). He also stated that nobody outside the bar was willing to speak with him about the shooting. (Id. at 243).
 {¶ 24} Ronald Martin, an officer with the Lima Police Department, stated that when he arrived at the scene, he began crowd control and saw a body on the *Page 14 
ground. (Id. at 249). Martin stated that he began searching the area for evidence and located a handgun in a parking lot directly south of the Bali Hai Lounge and on the opposite side of High Street. (Id. at 252). Martin stated that he asked other officers to widen the crime scene; that he stayed with the gun until an identification officer arrived; and that nobody, including himself, touched the gun during that time. (Id. at 256; 263).
 {¶ 25} David Hammond testified that he is an identification officer with the Lima Police Department. Hammond testified that he recovered the handgun secured by Martin. He stated that the gun appeared to be loaded and that he always used latex gloves when handling the gun. (Id. at 268; 319-320). Hammond testified that he tried to lift a latent palm print from the backstrap of the gun, but that he was unable to do so on his first attempt, so he sent the gun to BCI for testing. (Id. at 311). Hammond stated that he recovered two bullets and two shell casings, which were also sent to BCI. (Id. at 325). Hammond testified that he attended Webb's autopsy, which revealed a total of four wounds; two locations where the bullets entered the body, and two locations where the bullets exited the body. (Id. at 330).
 {¶ 26} Willie Hall testified that he was an employee of the Bali Hai Lounge at the time of the shooting. He stated that he does not drink alcohol and that he has never used illegal drugs. (Id. at 447). He stated that he has known Gibson for *Page 15 
approximately 25 years. (Id.). Hall arrived for work at the Bali Hai Lounge around 11:15 p.m. (Id. at 446). At approximately 2:15 a.m., he began moving people out the door so the bar could close, and he followed the crowd outside. (Id. at 449-450). Hall testified that while he was outside, he heard a bang, he turned, and he saw somebody standing over a guy. (Id. at 452). He then a heard a "quick bang" right over the body. (Id.). Hall testified that the shooter then turned toward him, and he recognized Gibson. (Id. at 453). Hall stated that he ran across the street and hid behind a concrete wall for 30-45 seconds, and during this time, he observed Gibson run in a westerly direction "toward the post office." (Id. at 455-456; 484; 486). On direct examination, Hall testified that he lied to police the first time he spoke with them because he was afraid to come forward. (Id. at 457-458).
 {¶ 27} Maria Bunley testified that she was a bartender at the Bali Hai Lounge and that she was working on the night of the shooting. (Id. at 339). Bunley stated that Gibson is a patron of the bar, and she knew him in that capacity. (Id. at 340). Bunley testified that she observed Gibson in the bar sometime between midnight and 1:00 a.m., but she had not seen Webb. (Id. at 344-345). Bunley stated that she did not see Gibson leave the bar, and she did not observe the shooting. (Id. at 342-343). She also testified that Willie Hall was an employee *Page 16 
of the Bali Hai Lounge, but that he was not in the bar and was not working on the night of the shooting. (Id. at 347).
 {¶ 28} John Heile, a forensic scientist at BCI, testified that he swabbed the handgun, which was admitted into evidence as State's Exhibit 5, for DNA evidence. (Id. at 354). He also conducted ballistic testing on two bullets that were recovered from the crime scene. Heile determined that the bullets, which were admitted into evidence as State's Exhibits 2 and 10, had been shot from the handgun, State's Exhibit 5. (Id. at 364-366). Heile also stated that the gun was operable.
 {¶ 29} Tony Farrow testified that he lives in an apartment above the Bali Hai Lounge and that he has known Gibson for approximately 15 years. (Id. at 396). Farrow testified that he was standing in front of Brownlee's Temporary Service, a business located directly to the west of the Bali Hai Lounge, when he observed Gibson walk up to Webb and shoot him. (Id. at 389-392). Farrow testified that Webb fell to the sidewalk, and Gibson stood over him and shot him again. (Id. at 393-394). Farrow testified that he did not hear any fighting or conversation between Gibson and Webb and did not observe any type of physical altercation prior to the shooting. (Id. at 393). During direct examination, Farrow testified that he had previously been convicted of grand theft, assault, "drugs," "weapons," drug trafficking, and drug possession. (Id. at 387). He also testified *Page 17 
that on the night of the shooting, he was standing outside smoking a blunt (marijuana). (Id. at 392). Farrow explained that he did not speak with the police immediately because he was carrying dope and did not want to be arrested. (Id. at 395). On cross-examination, Farrow testified that he had three criminal cases pending, but the state had not promised him anything in return for his testimony, and he did not expect any deals when he finally initiated contact with the police department. (Id. at 400; 402; 406). Farrow also stated that he had smoked two blunts earlier in the day, but that he was not high when he observed the shooting. (Id. at 397; 407-408).
 {¶ 30} Sheila Lipsey-Clarke testified that she was incarcerated at the county jail at the time of trial and that she had a prior conviction for assaulting a law enforcement officer. (Id. at 413). She testified that she is addicted to crack cocaine, and that on the night of the shooting, she had drank alcohol and smoked 10-13 rocks of cocaine mixed with marijuana behind the Royal Inn, located on Market Street. (Id. at 413; 415; 438). Lipsey-Clarke testified that she went to the Bali Hai Lounge looking for more money to buy crack cocaine. (Id. at 415). She testified that she met her "connection" inside the bar and went outside to wait for him. (Id. at 416). As she was waiting outside, she saw Gibson, who she was familiar with. (Id. at 417-418). Lipsey-Clarke stated she did not hear any words between Gibson and Webb, but she did see the shooting, and she identified Gibson *Page 18 
as the shooter. (Id. at 418). She stated that she saw the gun, but would not be able to identify it, and she stated that she had seen Gibson in the bar with a gun in his waistband. (Id. at 421). On direct examination, it became apparent that Lipsey-Clarke has poor eye-sight, but she testified that she had her glasses on when she witnessed the shooting and that she was able to see clearly with her glasses. (Id. at 423-424). She stated that she reported the incident at a later time for her own "peace of mind." (Id. at 426). On re-direct, Lipsey-Clarke testified that she had been incarcerated since May 7, so she had not had any drugs or alcohol prior to giving her testimony. (Id. at 439).
 {¶ 31} Timothy Clark, the lead detective in this case, is employed by the Lima Police Department. Clark testified that on the night of the shooting, the police department received phone calls from anonymous callers naming Gibson as the shooter. (Id. at 586). Clark stated that the callers identified Gibson either by his full name or by his street name, Christopher "Smalls." (Id.). Clark testified that he obtained an arrest warrant for Gibson, who was not in Lima. (Id. at 595). Clark stated that the police received tips that Gibson had traveled to Columbus, Ohio, Indianapolis, Indiana, Mississippi, or Georgia. (Id.). Clark's investigation revealed that Gibson was using a cell phone he has purchased at a Wal-Mart in Columbus, and that the phone records showed calls made in Hinesville, Georgia, which is where Gibson was arrested. (Id. at 596; 599-600). *Page 19 
 {¶ 32} The forensic evidence revealed that the palm print on the backstrap of the gun matched Gibson's right palm print. (Id. at 652). Heile had previously testified that he rarely gets fingerprints off guns because they are usually kept in a pocket or are oily if they are properly maintained. (Id. at 643-644). BCI also tested the DNA swabs from the gun. Those tests showed DNA from at least two male individuals, but excluded both Gibson and Webb. However, the expert witness who conducted the DNA test testified that it is possible to not leave DNA on an object or to leave an amount too small for testing. (Id. at 500). Also tested by BCI were swabs from two blood droplets that had been found on the sidewalk near the gun's location. The results indicated that the blood droplets were from the same person, but that they did not come from Gibson.
 {¶ 33} Gibson called seven witnesses and moved five exhibits into evidence. Gibson's first witness was Julia Heining, an expert witness who reviewed BCI's DNA test results. Heining testified that she did not do any independent testing. (Id. at 701). Heining testified that it is possible to leave DNA behind from a very slight touch, but that DNA deposits vary from "surface to surface," from "day to day," and from "moment to moment." (Id.). She also testified that an excited physical state could change the amount of DNA left behind. (Id.). *Page 20 
 {¶ 34} Brady Durr was a friend of the defendant. Durr testified that he was with Gibson on the night of the shooting. (Id. at 720). He testified that at approximately 12:20 a.m., he and Gibson went to the V.F.W. Post, where they stayed until approximately 1:15 a.m. (Id. at 722). Durr testified that he and Gibson then went to Marko's Bar, where they stayed until closing time. (Id.). Durr stated that he then drove them to the Bali Hai Lounge, where Gibson went inside to get them some drinks. (Id. at 723). Durr got out of his truck, and Gibson brought the drinks back to him. (Id. at 724). After delivering the drinks to Durr, Gibson got into a car driven by a girl named "Princess." (Id. at 723). Durr stated that as he stood near his truck drinking his beer, he heard two gunshots, and then heard two more. (Id. at 724). He stated that prior to the shooting, he had observed three people standing outside the Bali Hai Lounge having an argument, and they were the only three people in the area. (Id. at 733). Although Gibson did not properly notify the state or the court of this alibi testimony, the court allowed it.
 {¶ 35} Calvin Goode testified that he met Gibson sometime between 8:00 and 9:00 a.m. on October 8, 2005 at Gibson's girlfriend's apartment. (Id. at 741). Goode testified that he and Gibson spent the morning driving around and "kickin' it." (Id.). Goode stated that Gibson acted normal, but he admitted that he did not know how Gibson would react after shooting somebody in cold blood. (Id. at 741; 744). *Page 21 
 {¶ 36} Gibson elicited testimony from Gary Ericson, a private investigator, that he had been unable to contact Sheila Lipsey-Clarke and Willie Hall.
 {¶ 37} Scott Leiland, a detective with the Lima Police Department, testified where the blood droplets were located on the sidewalk, and David Hammond testified that he recovered a small amount of blood, which had partially dried on the rough sidewalk. (Id. at 767-768; 783). Hammond also demonstrated how a semi-automatic handgun is held and how it works. (Id. at 780-781). During the demonstration, the action on the gun pinched Hammond's hand. (Id.). Defense counsel used the demonstration to imply that the gun had pinched the shooter, who subsequently bled on the sidewalk. Hammond testified that he has been pinched by a similar gun before, but Gibson did not elicit any testimony as to whether the pinch could cause the shooter to bleed. (Id.). Also, Hammond stated there was no blood on the gun he recovered from the crime scene. (Id. at 784).
 {¶ 38} We have been asked to weigh the evidence in this case, yet there were several unclear aspects of the case, particularly as to where witnesses, evidence, the victim, and the defendant were located during the shooting. Many times throughout trial, the witnesses testified that they were standing "here" or "there" or that the defendant was "here" or "there." Using State's Exhibit 1, which was a diagram of the crime scene, and a pointer provided by the court, the witnesses established who was "here" or "there." However, trial counsel did not *Page 22 
complete their appellate record by asking the witnesses to mark the exhibit, nor did counsel verbally clarify where "here" and "there" were. As such, we cannot fully consider the testimony, and we must defer to the jury, which was able to view the witnesses, hear their testimony, and observe their use of the exhibit. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212.
 {¶ 39} We agree with Gibson that the state's eye-witnesses are not model citizens; one is an admitted crack addict, and the other was smoking marijuana when the shooting occurred. However, both testified that they were telling the truth, they had no doubt as to the identification, both had known the defendant for significant lengths of time prior to the offense, neither had problems with the defendant, and the state had made no promises in return for their testimony. On this record, the jury could have, and apparently did, place greater weight on and give greater credibility to the state's witnesses. We agree with Gibson that Willie Hall's credibility is questionable. However, even if we give little weight to Hall's testimony, the other eye-witnesses identified Gibson as the shooter, and Hall was able to describe the shooting with details that were supported by the other evidence.
 {¶ 40} The remaining evidence in this case is circumstantial. While circumstantial evidence can be powerful, the direct evidence clearly establishes that Gibson shot Webb without provocation. Furthermore, the circumstantial *Page 23 
evidence proves that Gibson's palm prints were on the backstrap of the gun in a location consistent with somebody holding the gun as if they were shooting it. Even though Gibson was excluded by the results of the DNA test on the gun, the experts testified that his DNA may not have been deposited on the gun, or any DNA that was deposited may have been too minimal to test. Therefore, the DNA test is not indicative of guilt, or the lack thereof, in this case.
 {¶ 41} The jury apparently discredited Brady Durr's testimony since the bartender testified that she saw Gibson in the Bali Hai Lounge at the same time Durr stated he was at the V.F.W. or Marko's. Durr testified that he saw Gibson leave, but he was unable to state that Gibson had not returned to the bar. The other testimony produced by the defendant did nothing to advance his case.
 {¶ 42} On this record, the jury's convictions are supported by the weight of the evidence, and we cannot find a manifest miscarriage of justice. The second assignment of error is overruled.
 {¶ 43} The judgment of the Allen County Common Pleas Court is affirmed.
Judgment affirmed.
 ROGERS, P.J., and PRESTON, J. concur.
[1] Throughout trial, the witnesses and counsel referred to the Bali Hai Lounge by several names, including the Bali Lounge and Stormy's. Regardless of which name was used, the witnesses and counsel were referring to the Bali Hai Lounge located at 218 West High Street, Lima, Ohio.
[2] "Smalls" is Christopher Gibson's "street name." *Page 1