[Cite as *State v. Frye*, 2018-Ohio-894.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  1-17-30

    v.

MARLON D. FRYE,                   O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2016 0433

Judgment Affirmed

Date of Decision:    March 12, 2018

APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Jana E. Emerick* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Marlon D. Frye ("Frye"), appeals the July 11, 2017 judgment entry of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} On December 15, 2016, the Allen County Grand Jury indicted Frye on three counts, including: Count One of having weapons while under disability in violation of R.C. 2923.13(A)(3), (B), a third-degree felony, Count Two of tampering with evidence in violation of R.C. 2921.12(A)(1), (B), a third-degree felony, and Count Three of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(a), a fifth-degree felony. (Doc. No. 4). The indictment contains a firearm specification under R.C. 2941.141(A) and a forfeiture specification under R.C. 2941.1417(A) as to Count One. (*Id.*). The forfeiture specification identifies "a .22 Caliber Derringer" as property subject to forfeiture. (*Id.*).

{¶3} On December 23, 2016, Frye appeared for arraignment and entered pleas of not guilty. (Doc. No. 13).

{¶4} On December 28, 2016, Frye filed a motion to suppress evidence "of the unwarranted searches of Mr. Frye's trash and invasion of his privacy." (Doc. No. 14). Specifically, Frye argued "that the trash pulls were done without warrant and over an unreasonable number of pulls." (*Id.*). The State filed its response to Frye's motion to suppress evidence on January 24, 2017. (Doc. No. 21). After a

hearing on March 6, 2017, the trial court denied Frye's motion to suppress evidence. (Doc. No. 30).

{¶5} Frye filed a motion to dismiss Count Three of the indictment on January 17, 2017. (Doc. No. 18). In his motion, Frye argued that "ADB-Fubinanca is not yet a Schedule I controlled substance, or at least was not one as of the date of the act leading to Count [Three] in the Indictment." (*Id.*). Frye filed a supplement to his motion to dismiss Count Three of the indictment on February 7, 2017. (Doc. No. 27). The trial court denied Frye's motion to dismiss Count Three of the indictment on March 7, 2017. (Doc. No. 31).

{¶6} On April 21, 2017, Frye filed a motion in limine requesting that Cornelius Patterson ("Patterson") and Timothy Frye ("Timothy") be granted immunity in exchange for their testimony. (Doc. No. 36). After a hearing on May 16, 2017, the trial court denied Frye's request to grant Patterson and Timothy immunity in exchange for their testimony on May 17, 2017. (Doc. No. 57).

{¶7} On May 23-25, a jury trial was held. (May 23-25, 2017 Tr., Vol. I, at 1); (May 23-25, 2017 Tr., Vol. IV, at 642). On May 25, 2017, the jury found Frye guilty as to the counts and specifications in the indictment. (Doc. Nos. 62, 63, 64); (May 23-25, 2017 Tr., Vol. IV, at 639-640). The trial court filed its judgment entry of conviction on May 26, 2017. (Doc. No. 65).

{¶8} On May 31, 2017, Frye filed a motion for a new trial under Crim.R. 33(A)(1) and (5) as to Count Three of the indictment arguing that the trial court "erred by adopting (over objection) an incorrect definition of 'constructive possession' into the Jury Instructions." (Doc. No. 69). On June 7, 2017, the trial court denied Frye's motion for a new trial. (Doc. No. 70).

{¶9} On July 10, 2017, the trial court sentenced Frye to 36 months in prison on Count One, one year in prison on the firearm specification, 9 months in prison on Count Two, and 9 months in prison on Count Three, and ordered that Frye serve the terms consecutively for an aggregate sentence of 54 months in prison. (Doc. No. 73). The trial court ordered forfeited the .22 Derringer. (*Id.*). The trial court filed its judgment entry of sentence on July 11, 2017. (*Id.*).

{¶10} Frye filed his notice of appeal on July 24, 2017. (Doc. No. 76). He raises eight assignments of error for our review. To facilitate our discussion, we will first address Frye's sixth and seventh assignments of error together, followed by his first, second, third, fourth, fifth, and eighth assignments of error.

### Assignment of Error No. VI

**The convictions for all three counts were against the manifest weight of the evidence.**

### Assignment of Error No. VII

**The conviction for Possession of ADB-Fubinaca was not supported by sufficient evidence.**

{¶11} In his seventh assignment of error, Frye argues that his possession-of-drugs conviction is based on insufficient evidence. In particular, he argues that the State presented insufficient evidence that he had constructive possession of the ADB-Fubinaca. In his sixth assignment of error, Frye argues that his convictions are against the manifest weight of the evidence. Regarding his possession-of-drugs conviction, he argues that the weight of the evidence shows that he did not knowingly possess a controlled substance.

{¶12} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). As such, we address each legal concept individually.

{¶13} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the

credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

**{¶14}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶15} At trial, the State offered the testimony of Investigator Jesse Harrod ("Investigator Harrod") of the Lima Police Department, assigned to the Lima/Allen County Interdiction Task Force ("Task Force"), who testified that the Task Force began investigating Frye in June 2016 after receiving a tip that an individual "that lived at 1109 St. Johns Avenue in Lima [] was dealing in large amounts of narcotics, specifically crack cocaine."  (May 23-25, 2017 Tr., Vol. II, at 230-231, 233). According to Investigator Harrod, through his five-month investigation, he learned that Frye resided at 1109 St. Johns Avenue.  (*Id.* at 234-235).

{¶16} Investigator Harrod testified that the Task Force conducted "a series of trash pulls from" 1109 St. Johns Avenue, which occurred "on Friday mornings, early Friday mornings—August 19th of 2016, October 28th of 2016 and November 4th of 2016."  (*Id.* at 236).  On November 4, 2016, Investigator Harrod prepared a search-warrant affidavit referencing the evidence discovered from the trash pulls as well as additional information he gathered over the course of his investigation.  (*Id.*). After obtaining the search warrant, Investigator Harrod "met with other Investigators with the Allen County Sheriff's Office S.W.A.T. team [("SWAT team")] to brief them on the location" because the SWAT team "was going to be securing the residence for us before the Investigators searched it."  (*Id.* at 244).

{¶17} Once law enforcement arrived at the residence and began to secure it, Investigator Harrod heard Investigator Trent Kunkleman ("Investigator

Kunkleman") of the Lima Police Department, assigned to the West Central Ohio Crime Task Force, "announce that there was a subject looking out of an upstairs bedroom window." (*Id.* at 246-247). Within seconds of Investigator Kunkleman's announcement, the SWAT team entered the residence. (*Id.* at 247). According to Investigator Harrod, based on that timing, the person looking out the bedroom window could not "have made it downstairs and then back upstairs before [the SWAT team] went in the front door." (*Id.*). After the residence was secure, law enforcement discovered two individuals in the residence—Frye and Patterson. (*Id.* at 247-248). "Frye was located in the downstairs bathroom, the first floor bathroom, and Mr. Patterson was located in an upstairs bedroom on the second floor." (*Id.* at 248).

**{¶18}** Investigator Harrod identified State's Exhibits 3-16 as photographs taken of the residence as it appeared on November 4, 2016. (*Id.* at 250). (*See* State's Exs. 3-16). Investigator Harrod described the items found by law enforcement:

> In the kitchen area there were multiple different areas where there were rubber gloves similar to the ones we found in the trash. There was a microwave plate that was located that contained a white crusty substance[, which tested positive for cocaine.] There was a small amount of marijuana, along with different drug paraphernalia, a grinder, a marijuana pipe, inside * * * the upper right hand cupboard

in the kitchen. We located a small brown leather holster * * * for a gun.

* * *

There was not a gun in it at the time it was located. Also located in that same cupboard was a plastic container containing what appeared to be a green leafy substance. However, it did not appear to be, through [Investigator Harrod's] training and experience, it did not appear to be marijuana. It appeared to [Investigator Harrod] to be K2, or a synthetic marijuana.

(May 23-25, 2017 Tr., Vol. II, at 256-257). Investigator Harrod identified State's Exhibit 17 as a photograph depicting the cupboard in which the narcotics paraphernalia, holster, and "green leafy substance" were found. (*Id.* at 257-258). He identified State's Exhibit 18 as a photograph depicting "the green leafy substance that did not have the same odor as marijuana" yet "appeared to have the same characteristics of [marijuana] just by looking at it," which was discovered in the cupboard. (*Id.* at 258). (*See also* State's Ex. 20). He identified State's Exhibit 19 as a photograph depicting the holster. (May 23-25, 2017 Tr., Vol. II, at 259). (*See also* State's Ex. 21).

{¶19} Investigator Harrod further testified that law enforcement discovered "a firearm * * * submerged in water inside the toilet bowl" while searching the

bathroom. (May 23-25, 2017 Tr., Vol. II, at 261). (*See* State's Exs. 22-27). According to Investigator Harrod, the firearm was loaded and the hammer was cocked back. (May 23-25, 2017 Tr., Vol. II, at 263-265).

{¶20} Investigator Harrod testified that he interviewed Patterson on November 4, 2016 and that Patterson informed him that "[h]e was on vacation from Mississippi," that "[h]e had been [in Lima] for approximately two to three weeks," and that "[h]e was a longtime friend of [Frye]." (*Id.* at 270). He testified that his investigation of Patterson did not reveal any "legal reason" prohibiting Patterson from having a firearm. (*Id.* at 279). Investigator Harrod testified that, just prior to the time the SWAT team entered the residence, Patterson "had been in the bathroom brushing his teeth prior to going upstairs to the bedroom, the second floor bedroom. He was opening the blinds when he observed the Officers approaching the house." (*Id.*). Stated differently, Patterson was not in the bathroom when the SWAT team entered the residence. (*Id.*).

{¶21} On cross-examination, Investigator Harrod described the synthetic marijuana. (*See id.* at 286-291). He also testified that law enforcement discovered marijuana in a mason jar while searching the residence; however, he testified that law enforcement "did not charge anybody with it" because "[i]t was at a minor misdemeanor level." (*Id.* at 291-292).

{¶22} Investigator Harrod testified that he learned that Patterson was arrested for "felony drug trafficking" in 2001 in Mississippi; however, Investigator Harrod did not know whether that arrest resulted in a conviction. (*Id.* at 298). Investigator Harrod agreed that a felony-drug-trafficking conviction "would typically create a weapons disability." (*Id.*).

{¶23} He testified that the residence contains one bathroom, which is located in the "back" of the residence next to the stairway. (*Id.* at 308, 310). When the SWAT team entered the residence, Patterson was found on the second floor of the residence and Frye was found on the first floor of the residence. (*Id.* at 309). According to Investigator Harrod, Patterson told him that he was the person looking out the second-floor-bedroom window. (*Id.* at 309-310). Specifically, Patterson told Investigator Harrod that, prior to law enforcement's entry into the residence, "[h]e went to the bathroom and brushed his teeth" and then "went back upstairs he said he was opening up the blinds and when he looked out he saw the Officers approaching." (*Id.* at 310). More specifically, Patterson informed Investigator Harrod that he was on the porch smoking a cigarette approximately five minutes before law enforcement entered the residence. (*Id.* at 313). After Patterson finished smoking his cigarette, he returned to the residence and went to the bathroom—the only bathroom in the residence and the bathroom in which the firearm was found—to brush his teeth. (*Id.* at 314-315). After brushing his teeth, Patterson then went

upstairs to look out the window "to look at the neighbors." (*Id.* at 315-316). After Patterson saw law enforcement approaching the residence, Frye went downstairs to the kitchen "right before the breach of the house." (*Id.* at 313, 316). To get to the kitchen from the stairway, Frye "had to walk from the stairs, past the bathroom, and to the kitchen." (*Id.* at 316-317).

{¶24} Investigator Harrod testified that law enforcement did not search the firearm, the plastic container containing the synthetic marijuana, or the firearm holster for fingerprints or DNA evidence. (*Id.* at 317-319).

{¶25} On re-direct examination, Investigator Harrod testified that Patterson's "lengthy" criminal record contains misdemeanor and "traffic convictions." (*Id.* at 320). He testified he did not see anyone outside of the residence when law enforcement "set up a perimeter for execution of the search warrant." (*Id.* at 321).

{¶26} On re-cross examination, he clarified that, although it is unclear because it contains offenses in other states, Patterson's criminal history also includes arrests for offenses that "appear" to be felonies. (*Id.* at 324-325).

{¶27} As its next witness, the State presented the testimony of Investigator Kunkleman, who testified that he assisted with the November 4, 2016 search-warrant execution. (*Id.* at 326-327). He testified that he was "assigned to the perimeter" at the time law enforcement entered the residence. (*Id.* at 328). He did

not observe anyone outside when he arrived at the residence. (*Id.*). While establishing a perimeter, Investigator Kunkleman

> watched as the Sheriff's Department's S.W.A.T. team began making
> their way to the front door of the house, which faces to the west. As
> they were doing that [he] looked up and at the second story window
> furthest to the north * * * there was somebody that peeked out the
> window. [He] could see * * * the blinds flip down and then flip back
> up.

(*Id.* at 329-330). Investigator Kunkleman announced his observation. (*Id.* at 330). "Seconds" later, law enforcement entered the residence. (*Id.*). He testified that it was not "possible [] that the person who was peeking out the blinds could have made it from that room, downstairs, and then back upstairs prior to the S.W.A.T. team making entrance." (*Id.* at 331). He testified that Patterson was found in the bedroom in which Investigator Kunkleman saw the person peeking out of the window. (*Id.* at 331-332).

{¶28} Investigator Kunkleman testified that he spoke with Frye after the search-warrant execution and testified that Frye "stated that he only smoked Loud," which is a type of marijuana. (*Id.* at 332-333). According to Investigator Kunkleman, Frye admitted that "that [law enforcement] probably found [Frye's Loud] in the house." (*Id.* at 332).

{¶29} On cross-examination, Investigator Kunkleman confirmed that it was "under a minute [for him] to go from [his] car, to observing this person peeking, to the house being breached and entry made into the house." (*Id.* at 352-353).

{¶30} Next, Lieutenant Gary Hook ("Lieutenant Hook") of the Allen County Sheriff's Office testified that he assisted with the November 4, 2016 search-warrant execution as part of the SWAT team. (*Id.* at 359-361). He indicated that his "assignment th[at] particular day was the point position, or the number one position in the line," meaning that he was the "person [who] led the team into the residence." (*Id.* at 361-362).

{¶31} Lieutenant Hook described the search-warrant execution:

Once we arrived it was a no-knock search warrant, which means we basically walk up to the residence and we breach the door. We announce as we enter. We continue with the search. So, from the time our team left the van to the approach of the door was roughly anywhere between fifteen and thirty seconds.

(*Id.* at 363). He described what he observed when law enforcement entered the residence:

Once the door was breached I immediately observed * * * an entry room and * * * a further room. I observed a black male, wearing no shirt, standing in the doorway. At that time I yelled "Sheriff's Office

-14-

– S.W.A.T., search warrant, get on the ground". The subject darted off to what would have been my right. So, my job at that point would be to close the distance so then they could secure that subject. I made my way through that first entryway and what I believe was a kitchen and turned to the right, the direction he was running, and I saw a door moving shut. I approached the door at the same time another S.W.A.T. operator approached the same door and he kicked it at about the same time that I arrived at it. Once the door came open I observed [Frye], who was to my left, and I ordered him down to the ground. He laid down to my right. So, I basically stood guard over [Frye] until I had another guy come up with a set of handcuffs. He secured [Frye]. When he did, I told him, "Make sure you check that area to the left carefully," because that's the area that I last saw him in. So, from that point he was secured. I left to perform a secondary search with another team member. When I returned to [Frye], who was still there, they were looking to the toilet and I seen [sic] a small handgun laying in the bottom of the actual toilet bowl.

(*Id.* at 363-364).

{¶32} Lieutenant Hook identified State's Exhibits 3, 4, 5, 6, 7, 9, and 30 as photographs of the residence as it appeared on November 4, 2016. (*Id.* at 364-368). He testified how those photographs illustrate his description of events. (*See id.*).

{¶33} On cross-examination, Lieutenant Hook clarified that, when he entered the residence, he "saw an individual go running from the kitchen" which he believed was Frye. (*Id.* at 375). However, because of the way that the residence is constructed, Lieutenant Hook "lost sight" of that individual running from the kitchen. (*Id.* at 375-376). (*See also* 369-375); (State's Exs. 3, 4, 5, 6, 7, 9, 30). Lieutenant Hook testified that he did not see Frye with a firearm or see him reach into any cabinets. (May 23-25, 2017 Tr., Vol. II, at 376).

{¶34} On re-direct examination, Lieutenant Hook testified that he lost sight of Frye for "less than ten seconds" after he saw him run from the kitchen. (*Id.* at 377). He testified that he did not see anyone else in the bathroom. (*Id.* at 377-378).

{¶35} Thereafter, the State moved to admit Exhibits 1-28, which were admitted without objection, and rested. (*Id.* at 446, 460). Next, Frye made a Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 461-462).

{¶36} Frye testified in his defense. (*Id.* at 463). Frye testified that he grew up in Mississippi and that he has known Patterson since they were six or seven years old. (*Id.*). Patterson was at Frye's residence on November 4, 2016. (*Id.* at 464). Frye testified that he was "[a]sleep upstairs" "[i]mmediately prior to law

enforcement coming into the house." (*Id.*). According to Frye, Patterson "was downstairs [because he] had a habit of every single morning [of getting] up about seven/seven-thirty in the morning cooking breakfast." (*Id.* at 464-465). Frye testified that he was still asleep on November 4, 2016 when law enforcement entered his residence because he "came home probably like five-thirty" in the morning. (*Id.* at 465). Frye described:

> [I] heard [Patterson] from downstairs. * * * I heard him holler. He called my name. I jumped up. I immediately jumped up out of my sleep. When I jumped up he was like, "Marlon, Marlon, something's going on. They're out there." That's what he was saying. As he was running up the stairs I jumped up and run [sic] down the stairs. At this time I was hearing windows busting and people at the door I could hear from the outside because it was a very loud commotion and it was loud outside. The door – somebody was hitting the door, the front door. As I was running down the stairs he was coming up the stairs. So, we kind of like crossed each other. By the time I made it to the living room * * * before I could even get to the kitchen, I could see the door when it first comes open. * * * So, my first reaction was, "oh, something's going on and I don't want to get shot". * * * My

-17-

first move was to dive into the bathroom to get out of the line of fire.

* * * So, I ran into the bathroom.

(*Id.* at 465-466).

**{¶37}** Frye testified that the gun found in the toilet is not his and he did not put it in the toilet. (*Id.* at 467). Frye admitted that the marijuana discovered in the kitchen is his marijuana. (*Id.* at 468). Frye also admitted that he saw another container containing "a green leafy substance" in his kitchen but denied that it belonged to him. (*Id.* at 469-470). Frye testified that he thought the container was "[t]rash" or low-grade marijuana, which he does not use. (*Id.* at 469). Frye opined that the ADB Fubinaca belonged to Patterson. (*Id.* at 470).

**{¶38}** On cross-examination, Frye testified that Lieutenant Hook's testimony that he discovered Frye by the toilet is "inaccurate." (*Id.* at 476-477).

**{¶39}** Thereafter, the defense rested. (*Id.* at 481).

**{¶40}** The State offered the rebuttal testimony of Lieutenant Hook. (*Id.* at 483). He testified that, when law enforcement entered the residence, "it was a one hit shot to the door" with "the ram device." (*Id.* at 485-486). Because he was the first in, Lieutenant Hook saw Frye standing "in the doorway" and "yelled, 'Get on the ground. Search warrant. Get on the ground.'" (*Id.* at 486-487). Despite Lieutenant Hook's commands, Frye "disappear[ed] to the right." (*Id.* at 487). Lieutenant Hook "went through [the kitchen] doorway and took a right and that's

-18-

where [Lieutenant Hook] saw the wood door close." (*Id.* at 488). Lieutenant Hook identified State's Exhibit 9 as a photograph of the bathroom depicting the wood door that he saw close. (*Id.*). After another law-enforcement officer "kicks in" the bathroom door, Lieutenant Hook saw Frye "standing" near "the toilet and there was some clothes baskets or some clothes down here on the ground." (*Id.* at 491-495). Lieutenant Hook ordered Frye to the ground, which Frye complied. (*Id.* at 495).

{¶41} On re-direct examination, Lieutenant Hook testified that "[i]t was a matter of seconds" for Lieutenant Hook to follow Frye to the bathroom when Frye did not comply with Lieutenant Hook's initial order "to get on the ground." (*Id.* at 514).

{¶42} On re-cross examination, Lieutenant Hook testified that, when he saw Frye standing in the bathroom, Frye was not leaning over the toilet. (*Id.* at 521).

{¶43} The State did not present any additional witnesses on rebuttal, and Frye renewed his Crim.R. 29(A) motion, which the trial court denied. (*Id.* at 522, 550). The matter was submitted to the jury, which found Frye guilty as to the counts and specification of the indictment. (May 23-25, 2017 Tr., Vol. IV, at 637, 639-640).

{¶44} As an initial matter, we must address Frye's argument that his having-weapons-while-under-disability and tampering-with-evidence convictions are against the manifest weight of the evidence. Although Frye asserts that he is

challenging the weight of the evidence supporting his convictions in the statement of his sixth assignment of error, his argument pertains only to the sufficiency of the evidence supporting those convictions. As such, we will limit our discussion to addressing the sufficiency of the evidence supporting those convictions. *Accord State v. Yoder*, 9th Dist. Wayne No. 15AP0017, 2016-Ohio-7428, ¶ 23 ("Because Mr. Yoder only presented a sufficiency argument, we decline to conduct a manifest weight analysis on his behalf."), citing *State v. Schmitz*, 9th Dist. Lorain Nos. 11CA010043 and 11CA010044, 2012-Ohio-2979, ¶ 36 and App.R. 16(A)(7). *See State v. Tabassum*, 9th Dist. Summit No. 25568, 2011-Ohio-6790, ¶ 5 ("Although, in the statement of his first assignment of error, Tabassum raises the issue of manifest weight, his arguments pertain only to the sufficiency of the evidence, and we limit our discussion accordingly."), citing App.R. 12(A)(2) and 16(A)(7). *See also State v. Dahms*, 3d Dist. Seneca No. 13-16-16, 2017-Ohio-4221, ¶ 78.

**{¶45}** As such, we first review the sufficiency of the evidence supporting Frye's having-weapons-while-under-disability, tampering-with-evidence, and possession-of-drugs convictions. *State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 355190, *1 (Mar. 26, 1999). We will begin by addressing Frye's sufficiency-of-the-evidence argument as it relates to his having-weapons-while-under-disability and tampering-with-evidence possession-of-drugs convictions, then we will address

his sufficiency-of-the-evidence argument as it relates to his possession-of-drugs conviction.

{¶46} The criminal offense of having weapons while under disability is codified in R.C. 2923.13, which provides, in relevant part:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse * * *.

R.C. 2923.13(A)(3). R.C. 2921.12 sets forth the offense of tampering with evidence and provides, in relevant part:

(B) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]

R.C. 2921.12(A)(1). Frye does not dispute the evidence concerning the underlying elements of his having-weapons-while-under-disability and tampering-with-evidence convictions; rather, he disputes the issue of identity as to the conviction. *See State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13. *See also State v. Littlejohn*, 8th Dist. Cuyahoga No. 101549, 2015-Ohio-875, ¶ 30. As such, we will address only the identity element of the offense. *Missler* at ¶ 13, citing *State v. Carter*, 2d Dist. Montgomery No. 25447, 2013-Ohio-3754, ¶ 9-12. "'It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue.'" *Id.*, quoting *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 27, citing *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19, and *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11.

**{¶47}** In support of his sufficiency-of-the-evidence challenge, Frye argues that a rational trier of fact could not have found that he put the gun in the toilet. He specifically argues that his convictions are based on insufficient evidence because "the entire case was circumstantial" since "[t]here was no observation of this alleged act, and the State had no physical evidence." (Appellant's Brief at 31). However, "'direct or circumstantial evidence is sufficient to establish the identity of a defendant as the person who committed a crime.'" *Missler* ¶ 13, quoting *Collins* at

¶ 19, citing *Lawwill* at ¶ 11. "'Circumstantial evidence' is the 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning or other facts.'" *Lawwill* at ¶ 12, quoting *State v. Wells*, 12th Dist. Warren No. CA2006-02-029, 2007-Ohio-1362, ¶ 11, citing *State v. Griesheimer*, 10th Dist. Franklin No. 05AP-1039, 2007-Ohio-837, ¶ 26. Circumstantial evidence has no less probative value than direct evidence. *Griesheimer* at ¶ 26, citing *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. *See also State v. Heinish*, 50 Ohio St.3d 231, 238 (1990) ("This court has long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.").

{¶48} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Frye was the person who put the gun in the toilet. In other words, the jury's decision to find that Frye had a weapons disability and tampered with evidence is rational—that is, that Frye was the last person to be seen where the gun was found. The State presented evidence that Frye was found in the bathroom and was observed standing near the toilet. *See State v. Davis*, 9th Dist. Lorain No. 97CA006691, 1998 WL 887141, *4 (Dec. 16, 1998) (concluding that the State presented sufficient evidence that Davis "was the perpetrator of th[e] crime" because he "was the last person seen with" the victim). Indeed, Lieutenant Hook saw Frye run to the bathroom immediately after law

enforcement entered the residence. Lieutenant Hook did not see anyone else in the bathroom. Furthermore, Patterson told Investigator Harrod that he was the person seen looking out the second-floor window when law enforcement was approaching the residence. Investigators Harrod and Kunkleman testified that it was not possible for someone to go from the second floor to the first floor and back to the second floor between the time Patterson was seen looking out the second-floor window and the time law enforcement entered the residence. Likewise, law enforcement found Patterson on the second floor.

{¶49} Based on that evidence, a rational trier of fact could have found beyond a reasonable doubt that Frye was the person who put the gun in the toilet. That is, a rational trier of fact could have found that Frye had a weapon under disability and tampered with evidence. Therefore, Frye's having-weapons-while-under-disability and tampering-with-evidence convictions are based on sufficient evidence.

{¶50} We also reject Frye's argument that his possession-of-drugs conviction is based on insufficient evidence. The criminal offense of possession of drugs is codified in R.C. 2925.11, which provides, "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.11(A). "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance

through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "The issue of whether a person charged with drug possession knowingly possessed a controlled substance 'is to be determined from all the attendant facts and circumstances available.'" *State v. Brooks*, 3d Dist. Hancock No. 5-11-11, 2012-Ohio-5235, ¶ 45, quoting *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998).

**{¶51}** "Possession of drugs can be either actual or constructive." *State v. Bustamante*, 3d Dist. Seneca Nos. 13-12-26 and 13-13-04, 2013-Ohio-4975, ¶ 25, citing *State v. Cooper*, 3d Dist. Marion No. 9-06-49, 2007-Ohio-4973, ¶ 2, citing *State v. Wolery*, 46 Ohio St.2d 316, 329 (1976) and *State v. Haynes*, 25 Ohio St.2d 264 (1971). "'A person has "actual possession" of an item if the item is within his immediate physical possession.'" *Id.*, quoting *State v. Williams*, 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶ 23. "A person has 'constructive possession' if he is able to exercise dominion and control over an item, even if the individual does not have immediate physical possession of it." *Id.*, citing *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus and *Wolery* at 329. "For constructive possession to exist, '[i]t must also be shown that the person was conscious of the presence of the object.'" *Id.*, quoting *Hankerson* at 91. "Finally, the State may prove the existence of the various elements of constructive possession of contraband by circumstantial evidence alone." *Id.*, citing *State v. Stewart*, 3d Dist. Seneca No. 13-08-18, 2009-

Ohio-3411, ¶ 51. *See also Jenks*, 61 Ohio St.3d at 272-73. "Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, are evidence that the trier of fact can consider in determining whether the defendant had constructive possession." *State v. Voll*, 3d Dist. Union No. 14-12-04, 2012-Ohio-3900, ¶ 19, citing *State v. Norman*, 10th Dist. Franklin No. 03AP-298, 2003-Ohio-7038, ¶ 31 and *State v. Baker*, 10th Dist. Franklin No. 02AP-627, 2003-Ohio-633, ¶ 23.

{¶52} Under his seventh assignment of error, Frye contends that there is insufficient evidence that he constructively possessed the ADB Fubinaca because "the State offered no evidence from which a reasonable jury could conclude that [Frye] intended to possess" that substance. (Appellant's Brief at 32). Because it is the only element Frye challenges on appeal, we review the sufficiency of the evidence supporting only whether he had constructive possession of the drugs. *Compare State v. Watts*, 3d Dist. Hancock No. 5-12-34, 2016-Ohio-257, ¶ 43.

{¶53} Viewing the evidence in a light most favorable to the prosecution, we conclude that Frye's possession-of-drugs conviction is supported by sufficient evidence. A rational trier of fact could have found that Frye had constructive possession of the ADB Fubinaca—that is, that he exercised dominion and control over the ADB Fubinaca. Indeed, Frye testified that he knew the ADB Fubinaca was in the cupboard in his kitchen. *Compare State v. Durr*, 4th Dist. Scioto No.

11CA3411, 2012-Ohio-4691, ¶ 51 (concluding that Durr's possession-of-drugs conviction was based on sufficient evidence because "the jury could properly infer Durr knew there were controlled substances in the house and he was capable of exercising dominion or control over them, establishing his constructive possession of the controlled substances"); *State v. Howard*, 4th Dist. Scioto No. 11CA3415, 2012-Ohio-4690, ¶ 52 (same); *State v. Williams*, 4th Dist. Scioto No. 11CA3408, 2012-Ohio-4693, ¶ 43 (same); *State v. Pippen*, 4th Dist. Scioto No. 11CA3412, 2012-Ohio-4692, ¶ 44 (same), *overruled on other grounds*, *State v. Mozingo*, 4th Dist. Adams No. 16CA1025, 2016-Ohio-8292. *See also State v. Alexander*, 8th Dist. Cuyahoga No. 90509, 2009-Ohio-597, ¶ 24 ("Inherent in a finding of constructive possession is that the defendant was conscious of the item and therefore had knowledge of it."), citing *Hankerson* at 91 (concluding that the "mere fact that property is located within premises under one's control does not, of itself, constitute constructive possession[;] * * * [i]t must also be shown that the person was conscious of the presence of the object"). Further, Frye's assertion that the ADB Fubinaca did not belong to him is inconsequential. *See State v. Grundy*, 9th Dist. Summit No. 19016, 1998 WL 852844, *10 (Dec. 9, 1998) ("It is also irrelevant that he did not admit that the cocaine was his. Sufficient evidence existed that Defendant had exercised dominion and control over the cocaine, and was in constructive possession of the substance.").

**{¶54}** Based on the facts and circumstances of this case, the jury could properly infer that Frye exercised dominion and control over the ADB Fubinaca. Therefore, we conclude that the State presented sufficient evidence that Frye constructively possessed the ADB Fubinaca. *See State v. Miller*, 9th Dist. Wayne No. 1911, 1984 WL 4736, *3 (Feb. 1, 1984) (rejecting Miller's sufficiency-of-the-evidence argument that the State failed to prove that he constructively possessed stolen property because he shared the residence with another person). Frye's possession-of-drugs conviction is based on sufficient evidence.

**{¶55}** Having concluded that Frye's having-weapons-while-under-disability, tampering-with-evidence, and possession-of-drugs convictions are based on sufficient evidence, we next address Frye's argument that his possession-of-drugs conviction is against the manifest weight of the evidence. *Velez*, 2014-Ohio-1788, at ¶ 76.

**{¶56}** In his challenge to the weight of the evidence regarding his possession-of-drugs conviction, Frye contends that the evidence supporting that Patterson possessed the ADB Fubinaca is weightier than the evidence that Frye possessed the ADB Fubinaca. Again, since it is the only element that he challenges, we will address the weight of the evidence supporting only whether Frye had constructive possession of the ADB Fubinaca. "Even removing the lens of favorability in favor of the prosecution, through which we examine the sufficiency of the evidence, this

is not an exceptional case where the evidence weighs heavily against the convictions." *State v. Suffel*, 3d Dist. Paulding No. 11-14-05, 2015-Ohio-222, ¶ 33.

**{¶57}** Frye argues that the weight of the evidence shows that Patterson brought the ADB Fubinaca with him from Mississippi since it was contained in a "plastic Tupperware" container, which is "consistent with travel." (Appellant's Brief at 31). As we noted above, it is irrelevant who *brought* the ADB Fubinaca to the residence; rather, the relevant inquiry is whether the weight of the evidence demonstrates that Frye exercised dominion and control over the ADB Fubinaca. *See State v. Hilton*, 9th Dist. Summit No. 21624, 2004-Ohio-1418, ¶ 24 ("The arguments * * * that the drugs and other items found may not have actually belonged to him, are ultimately inconsequential."); *Grundy*, 1998 WL 852844, at *11 ("ownership is irrelevant when considering whether an individual possessed a substance"). *See also State v. Hudson*, 11th Dist. Trumbull No. 2014-T-0097, 2018-Ohio-133, ¶ 57 (concluding that the fact that another person "also had access to the drugs in the locked bedroom * * * does not vitiate [Hudson's] conviction since the brothers could have had joint possession and control of the drugs"), citing *State v. Collier*, 8th Dist. Cuyahoga No. 78960, 2001 WL 1243925, *4 (Oct. 18, 2001), citing *State v. Smith*, 8th Dist. Cuyahoga No. 78277, 2001 WL 563077 (May 24, 2001) ("holding that '[j]oint possession * * * exists when two or more persons together have the ability to control an object, exclusive of others'").

**{¶58}** We conclude that the jury could reasonably infer from the evidence presented at trial that Frye exercised dominion and control over the ADB Fubinaca. "A jury can make reasonable inferences from the evidence." *State v. Knight*, 10th Dist. Franklin No. 16AP-288, 2016-Ohio-8134, ¶ 26. "'It is permissible for a jury to draw inferences from the facts presented to them.'" *Id.*, quoting *State v. Sanders*, 6th Dist. Lucas No. L-96-379, 1998 WL 78787, *3 (Feb. 13, 1998), citing *State v. Palmer*, 80 Ohio St.3d 543, 561 (1997). "'The weight given to an inference is a question for the trier of fact and will not be disturbed unless it is such that reasonable minds could not reach such a conclusion.'" *Id.*, quoting *Sanders* at *3, citing *Palmer* at paragraph four of the syllabus. As we discussed in our sufficiency-of-the-evidence analysis, Frye admitted that he knew the ADB Fubinaca was in the kitchen cupboard. In the same kitchen cupboard, law enforcement discovered marijuana, drug-use paraphernalia, and a gun holster. (*See* State's Exs. 17, 18, 19). Frye informed Investigator Kunkleman that law enforcement would probably find his marijuana while searching his residence. Moreover, Frye admitted that the marijuana discovered in that kitchen cupboard was his. Likewise, based on our discussion of Frye's having having-weapons-while-under-disability and tampering-with-evidence convictions, the jury could infer that Frye stored the gun in the holster. Based on that evidence, we cannot say that the jury lost its way in concluding that Frye exercised dominion and control over the ADB Fubinaca. As

such, Frye's possession-of-drugs conviction is not against the manifest weight of the evidence. *Compare Hudson*, 2018-Ohio-133, at ¶ 60 (rejecting a similar manifest-weight-of-the-evidence argument).

**{¶59}** Frye's sixth and seventh assignments of error are overruled.

### Assignment of Error No. I

**The Trial Court should have suppressed the fruits of the unwarranted searches of Mr. Frye's trash and invasion of his right to privacy under the Ohio Constitution.**

**{¶60}** In his first assignment of error, Frye argues that the trial court erred by denying his motion to suppress evidence. In particular, he argues that the trial court erred by concluding that the three "trash pulls" conducted by law enforcement did not violate his right to privacy under the Ohio Constitution.

**{¶61}** A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must

independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶62} Because it is the only issue that Frye challenges on appeal, we address only whether the trial court erred as a matter of law in concluding that Frye did not have a constitutionally protected privacy interest in the trash.

{¶63} The Fourth Amendment to the United States Constitution generally prohibits warrantless searches and seizures, and any evidence obtained during an unlawful search or seizure will be excluded from being used against the defendant. *State v. Steinbrunner*, 3d Dist. Auglaize No. 2-11-27, 2012-Ohio-2358, ¶ 12. The Fourth Amendment does not explicitly provide "that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment." *State v. Jenkins*, 3d Dist. Union No. 14-10-10, 2010-Ohio-5943, ¶ 9, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684 (1961) and *Weeks v. United States*, 232 U.S. 383, 394, 34 S.Ct. 341 (1914).

{¶64} Article I, Section 14 of the Ohio Constitution provides that the "right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated." This language is "virtually identical to the language of the Fourth Amendment." *State v. Hoffman*,

141 Ohio St.3d 428, 2014-Ohio-4795, ¶ 11. As such, in felony cases, "Article I, Section 14 of the Ohio Constitution affords the same protection as the Fourth Amendment." *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, ¶ 12. *See also State v. Robinette*, 80 Ohio St.3d 234, 239 (1997) ("[U]nless there are persuasive reasons to find otherwise," Article I, Section 14 of the Ohio Constitution should be interpreted in harmony with the Fourth Amendment to the U.S. Constitution.).

**{¶65}** In advancing his argument, Frye concedes that the United States Supreme Court concluded that the protections of the Fourth Amendment to the United States Constitution do not extend to trash that is voluntarily left for trash collection in an area which is susceptible to open inspections and "[a]ccessible to animals, children, scavengers, snoops, and to other members of the public." *California v. Greenwood*, 486 U.S. 35, 40, 108 S.Ct. 1625 (1988). (*See* Appellant's Brief at 7). Instead, Frye urges this court to conclude that the Ohio Constitution provides greater protection than the Fourth Amendment to the United States Constitution and prohibits warrantless trash pulls. Frye acknowledges that the Twelfth District Court of Appeals previously rejected this argument; however, he encourages this court to conclude differently. *See, e.g.*, *State v. Quinn*, 12th Dist. Butler No. CA2011-06-116, 2012-Ohio-3123, ¶ 16, 18.

**{¶66}** Although there are certain situations in which Article I, Section 14 of the Ohio Constitution provides greater protection than the Fourth Amendment to the

United States Constitution, a warrantless trash pull is not one of those situations. *Accord id.* at ¶ 16. *See State v. Adkins*, 12th Dist. Butler Nos. CA2014-02-036 and CA2014-06-141, 2015-Ohio-1698, ¶ 42 ("The Supreme Court of Ohio recently reiterated that Article I, Section 14 of the Ohio Constitution affords the same protection as the Fourth Amendment in felony cases."), citing *Jones* at ¶ 12. *See also Robinette* at 238-239; *State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, syllabus. Indeed, the Twelfth District concluded on multiple occasions that neither the Fourth Amendment nor the Ohio Constitution protect "garbage that is voluntarily left for trash collection." *Quinn* at ¶ 16, citing *State v. Young*, 12th Dist. Clermont No. CA2005-08-074, 2006-Ohio-1784, ¶ 16 and *State v. Ackers,* 12th Dist. Butler No. CA2007-07-163, 2008-Ohio-4164, ¶ 10. *See also Adkins* at ¶ 41-42. In reaching that conclusion, the Twelfth District

> reasoned that garbage voluntarily left for trash collection in an area which is susceptible to open inspections is not protected by the Fourth Amendment because "garbage is accessible to the public, anyone is free to examine it. Therefore the police are likewise free to search it for evidence of criminal activity."

*Quinn* at ¶ 16, quoting *Young* at ¶ 16, citing *State v. Sautter*, 6th Dist. Lucas No. L-88-324, 1989 WL 90630, *2 (Aug. 11, 1989) (finding that regardless of where the trash was located, once the trash was available for pickup by the collection service,

the police could pick it up and the evidence seized from the trash could be used to obtain a warrant to search defendant's home).

**{¶67}** In addition, Frye argues that we should enlarge the Ohio Constitution's protections based on the decisions of "four State Supreme Courts [that] have deemed a trash pull to violate their State constitution": New Mexico, New Jersey, New Hampshire, and Vermont. (Appellant's Brief at 8, citing *State v. Crane*, 329 P.3d 689 (N.M.2014), *State v. McAllister*, 366 N.J.Super. 251, 840 A.2d 967 (2004), *rev'd in part on other grounds*, 184 N.J. 17, 875 A.2d 866 (2005), *State v. Goss*, 150 N.H. 46, 834 A.2d 316 (2003), and *State v. Morris*, 165 Vt. 111, 680 A.2d 90 (1996)). In *Quinn*, the Twelfth District rejected a similar argument. *See Quinn* at ¶ 17. We likewise conclude that Frye's argument relying on cases from other states addressing the privacy interests implicated by trash pulls under those states' respective constitutions is unpersuasive. Because the Supreme Court of Ohio has not expanded the Ohio Constitution's protections beyond the protections of the Fourth Amendment in felony cases, we see no reason to deviate from that precedent and expand those protections. *See Jones* at ¶ 12.

**{¶68}** Accordingly, we conclude that Frye does not have a constitutionally protected privacy interest in the trash. *Quinn* at ¶ 18 ("Thus, in light of the Ohio Supreme Court's reluctance to expand the Ohio Constitution, our previous cases, and the lack of persuasive reasons appellant advances to enlarge the Ohio

Constitution's protections, we find that appellant did not have a constitutionality protected privacy interest in the garbage."); *Adkins* at ¶ 42 ("[Adkins's] trash was not protected under Article I, Section 14 of Ohio's Constitution. The police were free to conduct the trash pull without a search warrant or reasonable suspicion."). As such, the trial court did not err by denying Frye's motion to suppress evidence.

{¶69} Frye's first assignment of error is overruled.

**Assignment of Error No. II**

**The Trial Court should have dismissed Count III of the Indictment because the charge results from an unlawful delegation of legislative authority and because ADB-Fubinaca is in fact not a Schedule I drug.**

{¶70} In his second assignment of error, Frye argues that the trial court erred by denying his motion to dismiss Count Three of the indictment. Specifically, Frye contends that he could not be charged with possession of drugs in violation of R.C. 2925.11(A), (C)(1)(a) for possessing a substance—ADB Fubinaca—that did not constitute a schedule I controlled substance at the time of his arrest.

{¶71} "A motion to dismiss charges in an indictment tests the sufficiency of the indictment, without regard to the quantity or quality of evidence that may be produced by either the State or the defendant." *State v. Balo*, 3d Dist. Allen No. 1-10-48, 2011-Ohio-3341, ¶ 35, citing *State v. Eppinger*, 162 Ohio App.3d 795, 2005-Ohio-4155, ¶ 37 (8th Dist.). *See also State v. Thornsbury*, 4th Dist. Lawrence No. 12CA9, 2013-Ohio-1914, ¶ 6, citing *State v. Evans*, 4th Dist. Scioto No. 08CA3268,

2010-Ohio-2554, ¶ 18. "A reviewing court must examine the face of the charging instrument to determine its sufficiency." *Balo* at ¶ 35, citing *State v. Egler*, 3d Dist. Defiance No. 4-07-22, 2008-Ohio-4053, ¶ 14, *State v. Desote*, 3d Dist. Putnam Nos. 12-03-05 and 12-03-09, 2003-Ohio-6311, ¶ 8, and *Eppinger* at ¶ 37. "In determining whether an indictment is valid on its face, the proper inquiry is whether the allegations contained in the indictment constitute an offense under Ohio law." *Egler* at ¶ 14. "A motion to dismiss an indictment cannot properly be granted where the indictment is valid on its face." *Id.*

{¶72} An appellate court reviews de novo a trial court's denial of a motion to dismiss an indictment. *State v. Tayse*, 9th Dist. Summit No. 23978, 2009-Ohio-1209, ¶ 28, citing *State v. Whalen*, 9th Dist. Lorain No. 08CA009317, 2008-Ohio-6739, ¶ 7; *Whitehall v. Khoury*, 10th Dist. Franklin No. 07AP-711, 2008-Ohio-1376, ¶ 7, citing *Akron v. Molyneaux*, 144 Ohio App.3d 421, 426 (9th Dist.2001). *See also Balo* at ¶ 35 ("'The [sufficiency] of an indictment is a question of law, requiring a de novo review.'"), quoting *State v. Reinhart*, 3d Dist. Van Wert No. 15-06-07, 2007-Ohio-2284, ¶ 12; *Thornsbury* at ¶ 6 ("The sufficiency of an indictment is a question of law that we review de novo."), citing *Evans* at ¶ 18. "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27.

**{¶73}** The Ohio Legislature has set forth its policies and guidelines regarding controlled substances under the Controlled Substances Act contained in R.C. Chapter 3719. R.C. 3719.41 details the schedules of drugs subject to control by the Ohio Legislature, while R.C. 3719.43 and 3719.44 contain provisions for altering and updating the drug schedules. R.C. 3719.43 essentially states that when the United States Attorney General determines that a drug should be scheduled, the drug is automatically placed on the corresponding Ohio schedule. R.C. 3719.44 provides for the state board of pharmacy's review and amendment of the Ohio drug schedules at any time and also details guidelines for the board's consideration when it determines whether a compound should be added to or transferred from a particular schedule.

*State v. Ingram*, 64 Ohio App.3d 30, 32 (1st Dist.1989).

**{¶74}** Frye argues that ADB Fubinaca did not constitute a controlled substance under Ohio law at the time of his arrest under R.C. 3719.41 or by virtue of R.C. 3719.43 or 3719.44. Although it concedes that ADB Fubinaca was not designated as a federally controlled substance at the time of Frye's arrest, the State argues that ADB Fubinaca was classified as a schedule I controlled substance under Ohio law at the time of Frye's arrest under Ohio Adm.Code 4729-11-02.

{¶75} However, in response to the State's argument, Frye contends that the State Board of Pharmacy exceeded its rulemaking authority when it enacted Ohio Adm.Code 4729-11-02. "A challenge to an administrative agency's rulemaking authority is a question of law, and, therefore, we exercise de novo review." *Parrott v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 15AP-963, 2016-Ohio-4635, ¶ 24, citing *Vargas v. State Med. Bd.*, 10th Dist. Franklin No. AP-872, 2012-Ohio-2735, ¶ 8 and *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993). *See also Sterling Drug, Inc. v. Wickham*, 63 Ohio St.2d 16, 21-23 (1980) (reviewing "the issue of whether the board was authorized to adopt the controverted rule as a question of law").

> "The purpose of administrative rule-making is to facilitate the administrative agency's placing into effect the policy declared by the General Assembly in the statutes to be administered by the agency. In other words, administrative agency rules are an administrative means for the accomplishment of a legislative end."

*Parrott* at ¶ 25, quoting *Nelson v. Mohr*, 10th Dist. Franklin No. 13AP-130, 2013-Ohio-4506, ¶ 14, citing *Carroll v. Dept. of Adm. Servs.*, 10 Ohio App.3d 108, 110 (10th Dist.1983). "It is well-established that when by statutory authority an administrative agency promulgates rules and regulations governing its activities and procedures, such rules are valid and enforceable unless they are unreasonable or in

conflict with statutory enactments covering the same subject matter." *Nelson* at ¶ 14, citing *State ex rel. De Boe v. Indus. Comm.*, 161 Ohio St. 67 (1954). *See also Sterling Drug* at 19 ("the ultimate test as to the validity of an agency rule is whether it is unreasonable or unlawful"). The burden of proving that an administrative agency was without authority to adopt a rule for failing to follow the legislative conditions rests with the party challenging the rule. *See Sterling Drug* at 23-24 ("We have concluded such initial agency determination can be fairly accommodated * * * by according to the agency rule a presumption that the agency conclusion of the existence of jurisdictional facts was reached upon sufficient evidence and placing upon a plaintiff challenging the existence of such facts the burden to prove such non-existence by a preponderance of substantial, probative and reliable evidence upon the whole record sufficient to rebut such presumption and to establish the facts are other than as found by the agency.").

{¶76} Frye advances three arguments that Ohio Adm.Code 4729-11-02 exceeds the rulemaking authority conferred to the State Board of Pharmacy by the legislature: (1) that "the authorizing statute does not authorize the State Board of Pharmacy to include a class of chemicals onto a schedule by general description; (2) that it is "an unlawful delegation by the State Board of Pharmacy to the degree that the State Board of Pharmacy extends the power to establish a chemical substance as a Schedule I controlled substance by the action of 'an established

forensic laboratory'" and (3) that the State Board of Pharmacy did not consider the factors under R.C. 3719.44(B) in "determining whether to include or not include the substance and where to put the substance on the schedules." (Appellant's Brief at 13, 14).

{¶77} First, we note that the Ohio legislature constitutionally delegated the authority under R.C. 3719.43 and 3719.44 to the State Board of Pharmacy to revise the schedule of controlled substances. *See State v. Klinck*, 44 Ohio St.3d 108, 109 (1989), citing *Sterling Drug*. *See also State v. Cooper*, 3d Dist. Logan No. 8-84-31, 1985 WL 7217, *3 (Oct. 2, 1985) ("Therefore, we hold that R.C. 3719.44 does not involve an unconstitutional delegation of legislative power to an administrative agency (State Board of Pharmacy)."); *State v. Reed*, 14 Ohio App.3d 63 (4th Dist.1983), paragraph one of the syllabus ("R.C. 3719.44 which authorizes the State Board of Pharmacy to add, reschedule and delete amendments to the schedules of controlled substances established in R.C. 3719.41 is not an unconstitutional delegation of legislative power.").

{¶78} Turning to whether the State Board of Pharmacy acted unlawfully or unreasonably in enacting Ohio Adm.Code 4729-11-02 to classify synthetic cannabinoids—synthetic marijuana—as schedule I controlled substances, we conclude that the State Board of Pharmacy neither acted unlawfully nor unreasonably in establishing the rule. The Supreme Court of Ohio has addressed an

issue similar to that raised by Frye. *See Sterling Drug*. Specifically, the Court addressed whether the State Board of Pharmacy exceeded its scope of authority when "the board by rule, Ohio Adm.Code 4729-11-02, amended Schedule II to include pentazocine." *Id.* at syllabus. In that case, Sterling Drug argued, in part, that the State Board of Pharmacy exceeded its authority by classifying pentazocine as a schedule II controlled substance when "the statutory criteria in R.C. 3719.44 for the placement of a substance in Schedule II" were not satisfied. *Id.* Although the Court ultimately concluded that the State Board of Pharmacy acted unreasonably and unlawfully in classifying pentazocine as a schedule II controlled substance because the evidence in the record did not reflect the factors required under R.C. 3719.44(D), the rationale applied by the Supreme Court guides the outcome of this case.

{¶79} Regarding the authority of the State Board of Pharmacy to *generally* classify pentazocine as a schedule II controlled substance, the Court stated,

> R.C. 3719.44(A)(1) expressly authorizes the board to add a previously unscheduled *compound*, *mixture*, *preparation* or *substance* to any schedule. Nowhere in the legislative grant did the General Assembly limit or otherwise direct where, in an existing schedule, a new substance should be placed.

(Emphasis added.) *Id.* at 24.

{¶80} In this case, in addition to the authority under R.C. 3719.44, the State Board of Pharmacy enacted Ohio Adm.Code 4729-11-02 under the authority of R.C. 3719.28 and 4729.26. R.C. 3719.28 provides, in relevant part:

(A) The state board of pharmacy * * * shall adopt rules for administration and enforcement of Chapter 3719. of the Revised Code * * *. Such rules shall be designed to:

(1) Facilitate surveillance of traffic in drugs, to prevent the improper acquisition or use of controlled substances or their diversion into illicit channels;

(2) Aid the state board of pharmacy and state, local, and federal law enforcement officers in enforcing the laws of this state and the federal government dealing with drug abuse and control of drug traffic.

R.C. 3719.28(A).

{¶81} These statutes provided the State Board of Pharmacy with the ability to enact Ohio Adm.Code 4729-11-02. *See Sterling Drug* at 24. *Compare DDJ, Inc. v. Liquor Control Comm.*, 64 Ohio App.3d 828, 832 (10th Dist.1990) (concluding that because the statute vested "the commission with authority to enact regulations that promote" "'maintenance of public decency sobriety, and good order,'" the commission properly enacted an administrative rule seeking "to curb intoxication and drunk driving by limiting the time at which retail permit holders may offer

reduced drink prices"), quoting R.C. 4301.03(B). As such, based on the express authority under R.C. 3719.44(A)(1), Frye's argument that the State Board of Pharmacy was without authority to include a class of chemicals on the schedule of controlled substances is without merit.

{¶82} Moreover, Ohio Adm.Code 4729-11-02 is not unreasonable or unlawful to the extent that the State Board of Pharmacy relies on the chemical analysis conducted by an established forensic laboratory to determine if a substance constitutes a synthetic cannabinoid. It is well settled that the General Assembly may grant the authority to an administrative agency to promulgate "subordinate rules within prescribed limits" and determine the "facts to which the legislative policy is to apply" so long as the "General Assembly has laid down the policy and established the standards." *Burger Brewing Co. v. Thomas*, 42 Ohio St.2d 377, 384 (1975). *See also Cooper*, 1985 WL 7217, at *3 ("Additionally, the Supreme Court has recognized that it may at times be impractical for the legislature to mandate specific standards, and thus the requirement for specific standards may be relaxed to further the legislative purpose."), citing *Burger Brewing* at 384-385. The purpose of the administrative-rulemaking process is to "plac[e] the decision on facts with boards or commissions composed of men equipped with the necessary knowledge and experience pertaining to a particular field." *Sterling Drug* at 23, quoting *Farrand v. State Med. Bd.*, 151 Ohio St. 222 (1949).

**{¶83}** To effectively aid law enforcement enforce the law, deal with drug abuse, and control drug traffic, it is necessary to provide the State Board of Pharmacy the authority to revise the schedules of controlled substances based on its knowledge and expertise. *See Reed*, 14 Ohio App.3d at 67 ("Giving consideration to the evils to be remedied by the drug control legislation here considered, this effectively requires ongoing adjustments with the marketing of new drugs and the increased knowledge of the nature of existing drugs with a recognition that the General Assembly is not in continuous session, we hold the legislative standards constitutionally adequate in order that the will of the General Assembly, not the State Board of Pharmacy, be implemented."); *Cooper* at \*3 ("By its very nature, drug control legislation requires that periodic adjustments be made to conform with the marketing of new drugs. Thus, the General Assembly wisely authorized the State Board of Pharmacy to make the necessary revisions to the Schedules of Controlled Substances."). In promulgating Ohio Adm.Code 4729-11-02(B), "it is reasonable to presume that the background, knowledge of drugs and expertise of the board entered into such factual determination." *Sterling Drug* at 23.

**{¶84}** By way of illustration, Ohio Adm.Code 4729-11-02, known as the "Pharmacophore Rule," was promulgated to assist law enforcement in identifying, in part, the chemical structure of synthetic cannabinoids. *See* Ohio Attorney General's Center for the Future of Forensic Science at Bowling Green State

Case No. 1-17-30

University, *The Pharmacophore Rule*, http://forensic.project.agileoasis.com/one/1.html (accessed Jan 31, 2018). "The Pharmacophore Rule is a scientific approach utilized by the State of Ohio to schedule current and future yet unidentified synthetic cannabinoids." *Id.* Specifically, the rule provides, in relevant part,

(B) Except as otherwise provided in section 3719.41 of the Revised Code, any compound that meets at least three of the following pharmacophore requirements to bind at the CB1 and CB2 receptors, as identified by a report from an established forensic laboratory, is a schedule I controlled substance hallucinogen:

(1) A chemical scaffold consisting of substituted or non-substituted ring structures that facilitate binding of required elements (such as: indole compounds, indazoles, benzimidazoles or other ring types);

(2) Alkyl or aryl side chain off the chemical scaffold providing hydrophobic interaction with the CB1 and CB2 receptors;

(3) Carbonyl or ester or equivalent for hydrogen bonding;

(4) Cyclohexane, naphthalene ring, substituted butanamide or equivalent for steric requirements for CB1 and CB2 receptor binding.

Ohio Adm.Code 4729-11-02(B). Under the rule, a "pharmacophore" is defined as "the portion of a chemical structure that confers the activity of the substance." Ohio

-46-

Adm.Code 4729-11-01. More plainly, "[a] pharmacophore represents the minimum required parts of a drug or molecule needed to bind to a receptor. Binding to a receptor generates an effect in the body (usually in the brain), which has been documented by scientific studies." Ohio Attorney General, *Drug Chemistry Unit*, http://www.ohioattorneygeneral.gov/Law-Enforcement/Bureau-of-Criminal-Investigation/Laboratory-Division/Drug-Chemistry-Unit (accessed Jan. 31, 2018).

{¶85} Given the ever-evolving drug culture, especially with "synthetic designer drugs," Ohio Adm.Code 4729-11-02 was established to provide "an established forensic laboratory the ability to identify the synthetic cannabinoid pharmacophore found within a larger drug molecule." *Id.* Indeed, once "the first synthetic spice sold on the internet"—JWH-018—was classified as a schedule I controlled substance, criminals modified the chemical structure of JWH-018 "to try and stay ahead of law enforcement and crime laboratories." *See* Ohio Attorney General's Center for the Future of Forensic Science at Bowling Green State University, *The Pharmacophore Rule*, http://forensic.project.agileoasis.com/one/1.html (accessed Jan 31, 2018).

{¶86} Based on the purpose of the Pharmacophore Rule outlined above, the rule is reasonable and consistent with the General Assembly's delegation of power to the State Board of Pharmacy to facilitate the administration and enforcement of controlled substances. That is, Ohio Adm.Code 4729-11-02 is intended to facilitate

surveillance of traffic in synthetic cannabinoids as well as to prevent the improper acquisition and use of synthetic cannabinoids. That an established forensic laboratory must identify the pharmacophore properties of a substance does not constitute an unlawful delegation of authority from the State Board of Pharmacy to that laboratory. Rather, Ohio Adm.Code 4729-11-02(B) is a tool utilized by the Board of Pharmacy to determine factual information regarding a substance. *Compare Cooper*, 1985 WL 7217, at \*3, citing *Reed*, 14 Ohio App.3d at 67.

{¶87} We also reject Frye's argument that the State Board of Pharmacy was without authority to adopt Ohio Adm.Code 4729-11-02 because it did not consider the legislative factors under R.C. 3917.44(B). That statute provides:

(B)  In making a determination to add, remove, or transfer pursuant to division (A) of this section, the board shall consider the following:

(1)  The actual or relative potential for abuse;

(2)  The scientific evidence of the pharmacological effect of the substance, if known;

(3)  The state of current scientific knowledge regarding the substance;

(4)  The history and current pattern of abuse;

(5)  The scope, duration, and significance of abuse;

(6)  The risk to the public health;

-48-

(7) The potential of the substance to produce psychic or physiological dependence liability;

(8) Whether the substance is an immediate precursor.

R.C. 3917.44(B).

**{¶88}** Frye failed to meet his burden of proving that the State Board of Pharmacy did not comply with the conditions of R.C. 3917.44(B) in enacting Ohio Adm.Code 4729-11-02. Frye does not point to any specific evidence that those legislative conditions were not met. Rather, the administrative-rule history reflects that the State Board of Pharmacy considered those legislative conditions. In establishing the rule, the State Board of Pharmacy identified that synthetic cannabinoids "are likely to share effects with two Schedule I substances," including symptoms of "agitation, paranoia, confusion, violence, convulsions, unconsciousness, lethargy, nervousness, erratic behavior, driving as if intoxicated, inability to stand and slurred speech." State Board of Pharmacy, *Scheduling of Compounds, Rule Summary and Fiscal Analysis (Part A)*, http://www.registerofohio.state.oh.us/pdfs/4729/0/11/4729-11-02_PH_OF_A_RS_20140806_1533.pdf (accessed Jan. 31, 2018). Further, the State Board of Pharmacy proffered as a rationale for the administrative rule that "potential reformulations of banned synthetic cannabinoids * * * pose an emerging threat to the health and well-being of Ohio citizens." *Id.* Accordingly, it is apparent

that the State Board of Pharmacy considered the factors enumerated under R.C. 3719.44(B) when deciding to include synthetic cannabinoids on Ohio's schedule of controlled substances. Assuming that those facts are sufficient, as we are required to do, Ohio Adm.Code 4729-11-02(B) is consistent with the authority granted to the State Board of Pharmacy.

**{¶89}** For these reasons, we conclude that Ohio Adm.Code 4729-11-02 is reasonable and consistent with the authority granted to the State Board of Pharmacy. *See Hinton Adult Care Facility v. Ohio Dept. of Mental Health & Addiction Servs.*, 4th Dist. Ross No. 16CA3566, 2017-Ohio-4113, ¶ 33 ("As such, the rules appear to be consistent with the policy declared by the General Assembly (to protect individuals at risk of institutionalization), and also appear consistent with the authority granted to the agency to establish rules for implementation of the RSS program."). Because Frye's argument that the State Board of Pharmacy lacked the authority to classify ADB Fubinaca as a schedule I controlled substance is erroneous, the trial court did not err in denying Frye's motion to dismiss the indictment.

**{¶90}** Frye's second assignment of error is overruled.

### Assignment of Error No. III

**The Trial Court erred in rejecting Mr. Frye's due process requests as to witness immunity consideration.**

**{¶91}** In his third assignment of error, Frye argues that the trial court erred by denying his request for immunity under R.C. 2945.44 for Patterson and Timothy—witnesses he intended to call as part of his defense. Frye makes two arguments: (1) that the trial court should have granted Patterson and Timothy "Testimonial, or 'Use,' Immunity" and (2) that R.C. 2945.44 is "unconstitutional because of obvious Due Process and Equal Protection concerns in granting a right to the prosecution to compel witnesses to testify that is not equally extended to the defendant, who has a constitutional right to compulsory process." (Appellant's Brief at 15, 16).

**{¶92}** "In [Ohio], criminal procedure is governed entirely by statute." *State ex rel. Leis v. Outcalt*, 1 Ohio St.3d 147, 148 (1982). As such, the only authority for a trial court to grant immunity is through R.C. 2945.44, which provides in relevant part:

(A)  In any criminal proceeding in this state * * *, if a witness refuses to answer or produce information on the basis of the witness's privilege against self-incrimination, the court of common pleas of the county in which the proceeding is being held, unless it finds that to do so would not further the administration of justice, shall compel the witness to answer or produce the information, if both of the following apply:

(1) The prosecuting attorney of the county in which the proceedings are being held makes a written request to the court of common pleas to order the witness to answer or produce the information, notwithstanding the witness's claim of privilege;

(2) The court of common pleas informs the witness that by answering, or producing the information the witness will receive immunity under division (B) of this section.

(B) If, but for this section, the witness would have been privileged to withhold an answer or any information given in any criminal proceeding, and the witness complies with an order under division (A) of this section compelling the witness to give an answer or produce any information, the witness shall not be prosecuted or subjected to any criminal penalty in the courts of this state for or on account of any transaction or matter concerning which, in compliance with the order, the witness gave an answer or produced any information.

R.C. 2945.44(A), (B). *See Outcalt* at 148. "The mandate of the statute is clear: immunity may not be granted unless (1) the witness refuses to answer on the basis of his privilege against self-incrimination, (2) the prosecuting attorney makes a written request to order the witness to answer, and (3) the court informs the witness he will receive transactional immunity." *State ex rel. Koren v. Grogan*, 68 Ohio

St.3d 590, 592 (1994). "'Before granting immunity, the common pleas court must also determine, in its discretion, whether the prosecutor's request for immunity would further the administration of justice.'" *State v. Tomlinson*, 125 Ohio App.3d 13, 18 (11th Dist.1997), quoting *State v. Asher*, 112 Ohio App.3d 646, 653 (1st Dist.1996). "The decision of whether to grant immunity rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion." *Id.*, citing *State ex rel. Ney v. Niehaus*, 33 Ohio St.3d 118, 119 (1987). An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶93} As an initial matter, we must address whether Frye properly preserved this issue on appeal. Assuming without deciding that Frye properly raised the issue in his pretrial motion, as with similar pretrial motions requesting the trial court for a preliminary order, Frye was obligated to preserve the error with an objection, proffer, or ruling on the record at the proper point during trial. *See State v. Maurer*, 15 Ohio St.3d 239, 259 (1984), fn. 14. Frye failed to do so. As such, he waived all but plain error. *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 115, citing Crim.R. 52(B) and *State v. Hartman*, 93 Ohio St.3d 274, 286 (2001). *See also State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 53 ("'"[T]he denial of a motion in limine does not preserve a claimed error for review in the absence of

a contemporaneous objection at trial."'"), quoting *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 59, quoting *State v. Hill*, 75 Ohio St.3d 195, 203 (1996).

**{¶94}** Crim.R. 52(B) governs plain-error review in criminal cases. *State v. Risner*, 73 Ohio App.3d 19, 24 (3d Dist.1991). For there to be plain error under Crim.R. 52(B), the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain-error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990). We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 110 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

**{¶95}** It was not plain error for the trial court to deny Frye's request for immunity for Patterson and Timothy under R.C. 2945.44 for two reasons. First, Frye requested that the trial court grant Patterson and Timothy "use" immunity. Under R.C. 2945.44, "Ohio courts may grant *only* transactional immunity," which "protects the witness from prosecution for any criminal activity about which he testified within the limits of the grant." (Emphasis added.) *Grogan*, 68 Ohio St.3d

at 592-593. "'Transactional immunity' is broader than 'use immunity' because it completely prohibits the government from prosecuting the defendant for the immunized crimes, rather than merely preventing the use of the immunized testimony." *State v. Adams*, 153 Ohio App.3d 134, 2003-Ohio-3086, ¶ 31 (7th Dist.), quoting *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653 (1972). Because "use" immunity is not recognized under Ohio law, it was not plain error for the trial court to reject Frye's request. *See Outcalt*, 1 Ohio St.3d at 148 (the trial court was "without statutory authority to grant use immunity").

{¶96} Second, the trial court did not have the statutory authority to grant Patterson or Timothy immunity because neither witness was called to testify. Because neither witness was called to testify, neither Patterson nor Timothy refused to testify on Fifth Amendment grounds. *See id.* at 149 (concluding that the trial court exceeded its "authority by needlessly granting immunity to a witness who *never* refused to testify on Fifth Amendment grounds"). *Compare State v. Reed*, 10th Dist. Franklin No. 08AP-20, 2008-Ohio-6082, ¶ 53 ("There was no effort to call McKinney, to proffer McKinney as a witness, or any request to personally question McKinney on the issue of invoking the Fifth Amendment. Further, the record is void of any evidence to suggest that McKinney would have done anything other than invoke his Fifth Amendment rights."). Likewise, there is no written request from the State requesting the trial court order the witnesses to testify. *See*

*State. v. Marshall*, 3d Dist. Crawford No. 3-83-13, 1984 WL 8001, \*4 (Apr. 11, 1984) (concluding that the trial court did not err by denying Marshall's witness-immunity request because there was no "written request [from the State] and no other basis for a grant of immunity by the state exist[ed]"); *State v. Davis*, 9th Dist. Lorain No. 88CA004390, 1990 WL 49985, \*21 (Apr. 18, 1990) ("Pursuant to R.C. 2945.44(A), a trial court may grant immunity only upon the written request of the prosecuting attorney."), citing *Outcalt* at 149. Accordingly, the trial court did not commit plain error by denying immunity under R.C. 2945.44 for Patterson and Timothy. *See Marshall* at \*4 (concluding that it is not an error for a trial court to refuse a defendant's request for witness immunity under R.C. 2945.44). *See also Outcalt* at 149 (concluding that the trial court "went beyond the scope of [its] statutory authority in granting immunity at the defendant's request, over the prosecutor's objection").

{¶97} Moreover, to the extent that Frye attacks the constitutionality of R.C. 2945.44, the trial court did not commit plain error in rejecting his argument. At first glance, it appears that Frye is facially attacking the constitutionality of R.C. 2945.44 on equal-protection grounds. However, Frye's argument does no more than hint that R.C. 2945.44 "seems to be a violation of equal protection principles, as one party (the prosecution) has an enhanced ability to compel testimony, a power enhanced over the constitutional right of the accused." (Appellant's Brief at 16).

Rather, Frye's argument requests that this court adopt the procedure adopted in *Carter v. United States*, 684 A.2d 331 (D.C.1996), and

> remand the case with instruction to conduct a hearing as to whether the proffered testimony would have been material. The Trial Court should be directed to then, if so ruling, submit the question to the prosecution per the *Carter* procedure, somewhat in a modified hearing along the lines of a new trial motion.

(Appellant's Brief at 20).

**{¶98}** Because a party challenging the constitutionality of a statute carries the burden of proving that it is unconstitutional, we decline to address Frye's "statement" regarding the constitutionality of R.C. 2945.44 since he offered no argument in support of any constitutional challenge. *See In re Washington*, 10th Dist. Franklin No. 04AP-429, 2004-Ohio-6981, ¶ 19 ("Thus, the party challenging a statute must prove that it is unconstitutional beyond a reasonable doubt."), citing *State v. Collier*, 62 Ohio St.3d 267, 269 (1991) and *State v. Bennett*, 150 Ohio App.3d 450, 2002-Ohio-6651, ¶ 16 (1st Dist.). *See also State v. Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7, citing *State v. Cook*, 9th Dist. Summit No. 20675, 2002 Ohio-2646, ¶ 27; App.R. 12; App.R. 16.

{¶99} Turning to Frye's argument urging this court to adopt the procedure illustrated by the court in *Carter*, we decline to do so. The procedure prescribed by the court in *Carter* provides:

> If, after a hearing, the trial court were to conclude that, all circumstances considered, the defendant will not receive a fair trial without the testimony of a crucial defense witness whose testimony meets the mandatory requirements we have previously spelled out in this opinion (exculpatory evidence, etc.), and importantly, the government does not submit to the court a reasonable basis for not affording use immunity to the crucial witness in order to procure the vital defense testimony, then the trial court would be justified in informing the government that it must make the choice between dismissal of the indictment or some other commensurate remedy which the court may fashion on Sixth Amendment and due process grounds, or affording use immunity to the crucial defense witness involved who is shown to be the only witness who, if believed, would clearly establish a reasonable doubt on the defendant's guilt.

*Carter* at 343.

{¶100} *Carter* is entirely distinguishable from the facts of this case. Namely, not only did the witness-immunity statute at issue in *Carter* authorize "use" *and*

"transactional" immunity, the analysis in *Carter* focuses *only* on "use" immunity. *See id.* at 340, fn. 5, 342. Since, as we discussed above, Ohio authorizes only transactional immunity, we reject Frye's argument. For these reasons, the trial court did not commit plain error in rejecting Frye's request.

{¶101} Frye's third assignment of error is overruled.

### Assignment of Error No. IV

**Mr. Frye was denied a fair trial because the Trial Court over objection defined possession in the context of a controlled substance and improperly denied the defense motion for a new trial on that issue.**

{¶102} In his fourth assignment of error, Frye argues that the trial court erred by denying his motion for a new trial on the basis that the trial court incorrectly defined "possession" for the jury.

{¶103} Motions for new trial are governed by Crim.R. 33(A), which provides, in relevant part, that a trial court may grant a new trial when there is an "[i]rregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial" or an "[e]rror of law occurring at the trial." Crim.R. 33(A)(1), (5). "A reviewing court will not disturb a trial court's decision granting or denying a Crim.R. 33 motion for new trial absent an abuse of discretion." *State v. Sanders*, 188 Ohio App.3d 452, 2010-Ohio-3433, ¶ 18 (10th Dist.), citing *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 82, citing *State v. Schiebel*, 55 Ohio St.3d 71,

76 (1990). As we noted above, for a trial court to have abused its discretion, it must have acted unreasonably, arbitrarily, or unconscionably. *Adams*, 62 Ohio St.2d at 157. "A new trial should not be granted unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule or was thereby prevented from having a fair trial." *Sanders* at ¶ 18, citing *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 35 (10th Dist.).

**{¶104}** In support of his claim that a new trial is warranted, Frye argues that the trial court erred by submitting to the jury, the following jury instruction defining "possession":

> A person has constructive possession if he is *able to* exercise dominion and control over an item, even if the individual does not have immediate physical possession of it. For constructive possession to exist, it must also be shown that the person was conscious of the presence of the object. The State may prove the existence of the various elements of constructive possession of drugs by circumstantial evidence alone.

(Emphasis added.) (Doc. No. 69, quoting May 23-25, 2017 Tr., Vol. IV, at 627). Frye argues that the trial court's instruction is an incorrect definition of constructive possession under Ohio law and that that the trial court should have replaced the

mens rea of that definition of constructive possession—"able to"—with "knowingly." (*See* Appellant's Brief at 24).

**{¶105}** "Ordinarily, the trial court has discretion to decide to give or refuse a particular instruction, and an appellate court will not disturb that decision absent an abuse of discretion." *State v. Teitelbaum*, 10th Dist. Franklin No. 14AP-310, 2016-Ohio-3524, ¶ 127, citing *Clark v. Grant Med. Ctr.*, 10th Dist. Franklin No. 14AP-833, 2015-Ohio-4958, ¶ 50. "However, when a jury instruction contains an incorrect statement of the law, a reviewing court applies a mixed de novo and abuse of discretion standard of review." *Id.*, citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 21, citing *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93 (1995). "Thus, '[i]n examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights."'" *Id.*, quoting *Kokitka* at 93, quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208 (1990).

**{¶106}** The trial court's jury instruction is not an incorrect statement of law. This court has defined "constructive possession" on a number of occasions using the "able to" language as well as the "knowingly" language. *See, e.g.*, *Watts*, 2016-Ohio-257, at ¶ 11 ("'A person has "constructive possession" if he is able to exercise dominion and control over an item, even if the individual does not have immediate

physical possession of it.'"), quoting *Bustamante*, 2013-Ohio-4975, at ¶ 25, citing *Hankerson*, 70 Ohio St.2d 87, at syllabus and *Worley*, 46 Ohio St.2d at 329; *State v. Gervin*, 3d Dist. Marion No. 9-15-51, 2016-Ohio-5670, ¶ 11 ("'[c]onstructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession'"), quoting *Hankerson* at syllabus. The interchangeable use of those phrases does not change the culpability required to constructively possess an item. Indeed, our sister appellate districts define constructive possession using those phrases synonymously. *See, e.g.*, *State v. Bettis*, 1st Dist. Hamilton No. C-060202, 2007-Ohio-1724, ¶ 10; *State v. Bailey*, 1st Dist. Hamilton Nos. C-060089 and C-060091, 2007-Ohio-2014, ¶ 36; *State v. Greenwood*, 2d Dist. Montgomery No. 19820, 2004-Ohio-2737, ¶ 52; *State v. Sisson*, 2d Dist. Montgomery No. 22173, 2008-Ohio-3490, ¶ 10; *State v. Kingsland*, 177 Ohio App.3d 655, 2008-Ohio-4148, ¶ 13 (4th Dist.); *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009-Ohio-5390, ¶ 19; *State v. Smith*, 5th Dist. Licking No. 16-CA-15, 2016-Ohio-7390, ¶ 98; *State v. Hailey*, 5th Dist. Stark No. 10-CA-287, 2011-Ohio-2761, ¶ 14; *State v. Gist*, 6th Dist. Lucas No. L-12-1355, 2014-Ohio-3274, ¶ 15; *State v. Reyes*, 6th Dist. Wood No. WD-02-069, 2004-Ohio-2217, ¶ 20; *State v. St. John*, 7th Dist. Belmont No. 09 BE 13, 2009-Ohio-6248, ¶ 19; *State v. Chambers*, 179 Ohio App.3d 770, 2008-Ohio-6973, ¶ 25 (7th Dist.); *State v. Harris*, 8th Dist. Cuyahoga Nos. 98183 and

98184, 2013-Ohio-484, ¶ 16; *State v. Dues*, 8th Dist. Cuyahoga No. 100861, 2014-Ohio-5276, ¶ 16; *State v. Graves*, 9th Dist. Lorain No. 08CA009397, 2011-Ohio-5997, ¶ 15; *State v. Acevedo*, 9th Dist. Lorain No. 14CA010710, 2016-Ohio-7344, ¶ 12; *State v. Hurse*, 10th Dist. Franklin No. 14AP-687, 2015-Ohio-2656, ¶ 21; *State v. Williams*, 10th Dist. Franklin No. 09AP-1072, 2010-Ohio-5259, ¶ 12; *State v. Hudson*, 11th Dist. Trumbull No. 2014-T-0097, 2018-Ohio-133, ¶ 47; *State v. Waters*, 11th Dist. Trumbull No. 2008-T-0121, 2009-Ohio-6151, ¶ 19, *State v. Downing*, 12th Dist. Brown No. CA2009-09-036, 2010-Ohio-5957, ¶ 18; *State v. Wilkins*, 12th Dist. Clinton No. CA2007-03-007, 2008-Ohio-2739, ¶ 24.[1]

{¶107} Although it does not define "constructive possession," *Ohio Jury Instructions* directs readers to a case defining constructive possession with the "able to" language. *Ohio Jury Instructions*, CR Section 525.11 (Rev. Dec. 10, 2016); *State v. Mason*, 8th Dist. Cuyahoga No. 78606, 2001 WL 755831, *5 (July 5, 2001). Further, the record reflects that the trial court relied on precedent of this court that is congruent to the case referenced in the *Ohio Jury Instructions*. (May 23-25, 2017 Tr., Vol. IV, at 570-571). *See State v. Warren*, 8th Dist. Cuyahoga No. 87726, 2006-

---

[1] The Supreme Court of Ohio has defined "constructive possession" on three occasions. *See State v. Wolery*, 46 Ohio St.2d 316, 329 (1976) ("Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his immediate physical possession."); *State v. Lilliock*, 70 Ohio St.2d 23, 27 (1982) ("'Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his immediate physical possession.'"), quoting *Wolery* at 329; *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus ("Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession."), citing *Wolery*; *but see Hankerson* at 91 (defining "constructive possession" without the word "knowingly"), citing *Wolery*.

Ohio-6415, ¶ 29 ("The trial court's instruction here substantially complies with that which this court has previously found permissible."). It is significant that the trial court's jury instruction is consistent with this court's precedent and the *Ohio Jury Instructions*. *See State v. Ellis*, 10th Dist. Franklin No. 11AP939, 2012-Ohio-3586, ¶ 12 (noting that, although "the *Ohio Jury Instructions* are not binding legal authority, it is significant that the trial court's instructions here are also consistent with the language from the *Ohio Jury Instructions*").

{¶108} For these reasons, we conclude that the trial court's jury instruction did not mislead the jury and is a correct statement of law. *Compare Warren* at ¶ 28-29 (rejecting Warren's argument that the jury instruction was flawed because it used the "able to" language); *Harris*, 2013-Ohio-484, at ¶ 17-18 (rejecting Harris's argument that the jury instruction using the "able to" language "allowed the jury to find constructive possession simply if the defendant was able' to exercise dominion and control").

{¶109} As such, Frye was not prejudiced or prevented from having a fair trial. Thus, the trial court did not abuse its discretion by denying Frye's motion for a new trial.

{¶110} Frye's fourth assignment of error is overruled.

**Assignment of Error No. V**

**Prosecutorial misconduct deprived Mr. Frye of a fair trial.**

{¶111} In his fifth assignment of error, Frye points to two instances that he argues demonstrates prosecutorial misconduct and denied him a fair trial. Specifically, he argues that the State failed to disclose "a printout of Mr. Patterson's arrest record" and elicited false and prejudicial testimony.

{¶112} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Liles*, 3d Dist. Allen No. 1-14-61, 2015-Ohio-3093, ¶ 31, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "'To establish prejudice, a defendant must show that a reasonable probability exists that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. Thus, "[n]ot every intemperate remark by counsel can be a basis for reversal."'" *Id.*, quoting *State v. Porter*, 4th Dist. Meigs No. 10CA15, 2012-Ohio-1526, ¶ 20, quoting *Landrum*, 53 Ohio St.3d at 112.

{¶113} Frye's two arguments are necessarily intertwined. That is, Frye takes issue with "[t]he method of enabling * * * the jury [to] reach th[e] false inference." (Appellant's Brief at 29). He argues that, despite his request "for criminal records of intended State witnesses," the State failed to disclose Patterson's "arrest record" even though the State originally intended to call Patterson as a witness. (*Id.* at 29). He argues, "[a]t trial, the State refused to provide [Patterson's] criminal record, however, claiming at the last minute that the State had decided not to call Mr.

Patterson as a witness, rendering that information non-discoverable." (*Id.*). Instead, "[a]fter handing a printout of Mr. Patterson's arrest record to their law enforcement witness, a printout not yet shared with the defense (despite objection), the prosecution asked the officer if anything in that record established that Mr. Patterson had a weapons disability, to enable the answer, 'No.'" (*Id.* at 29-30). Frye contends that the State's deceptive behavior prejudiced his trial because "[n]ot revealed to the jury were the extensive felony arrest record and the fact law enforcement made no effort to follow up on 'disposition unknown' entries in the arrest record." (*Id.* at 30).

{¶114} Crim.R. 16 provides the discovery rules for criminal proceedings. *State v. Engle,* 166 Ohio App.3d 262, 2006-Ohio-1884, ¶ 7 (3d Dist.). Crim.R. 16 provides, in relevant part,

(B) Discovery: Right to Copy or Photograph. Upon receipt of a written demand for discovery by the defendant, and except as provided in division (C), (D), (E), (F), or (J) of this rule, the prosecuting attorney shall provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were

> obtained from or belong to the defendant, within the possession of, or reasonably available to the state, subject to the provisions of this rule:
>
> * * *
>
> (2) Criminal records of the defendant, a co-defendant, and the record of prior convictions that could be admissible under Rule 609 of the Ohio Rules of Evidence of a witness in the state's case-in-chief, or that it reasonably anticipates calling as a witness in rebuttal.

Crim.R. 16(B)(2). *See State v. Leonard*, 4th Dist. Lawrence No. 93 CA 42, 1994 WL 583704, *2 (Oct. 20, 1994) ("Crim.R. 16(B)(1)(e) requires that the prosecutor furnish the defendant with prior felony records of prosecution witnesses."), citing *State v. Spikes*, 67 Ohio St.2d 405, 414 (1981).

{¶115} The failure to comply with Crim.R. 16 is governed by Crim.R. 16(E)(3), which provides:

> "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

*Engle* at ¶ 7, quoting Crim.R. 16(E)(3).

**{¶116}** "The trial court's decision regarding a Crim.R. 16 discovery sanction is reviewed under an abuse of discretion standard." *State v. Stiles*, 3d Dist. Allen No. 1-08-12, 2009-Ohio-89, ¶ 45, citing *State v. Gibson*, 3d Dist. Allen No. 1-06-74, 2007-Ohio-3345, ¶ 12. As we previously stated, to constitute an abuse of discretion, the trial court's decision must be unreasonable, arbitrary, or unconscionable. *Adams*, 62 Ohio St.2d at 157-158. "'[I]n determining the appropriate sanction, the trial court must make an inquiry into the circumstances of the discovery violation.'" *Stiles* at ¶ 45, quoting *Engle* at ¶ 8, citing *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 (1987), paragraph two of the syllabus. "Further, 'the trial court "must impose the least severe sanction that is consistent with the purpose of the rules of discovery."'" *Id.*, quoting *Engle* at ¶ 8, quoting *Papadelis* at paragraph two of the syllabus.

**{¶117}** The prosecution's violation of Crim.R. 16 is reversible error "only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 131, citing *State v. Parson*, 6 Ohio St.3d 442, 445 (1983).

**{¶118}** In this case, the trial court determined that the State did not violate the discovery rules; yet, it ordered the State to provide Patterson's criminal-history

printout to Frye. Although we defer to the trial court's discovery-violation determinations, we highly discourage the State's conduct in this case. *See State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 19 (stating that "[t]he overall objective of the criminal rules '"is to remove the element of gamesmanship from a trial"'" and "[t]he purpose of the discovery rules 'is to prevent surprise and the secreting of evidence favorable to one party.'"), quoting *Papadelis* at 3, quoting *State v. Howard*, 56 Ohio St.2d 328, 333 (1978).

**{¶119}** In 2010, the Supreme Court of Ohio "amended the discovery process in criminal cases." *State v. Athon*, 136 Ohio St.3d 43, 2013-Ohio-1956, ¶ 17.

> Crim.R. 16(A) now states, "This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A) further indicates that "[a]ll duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal."

*Id.*

**{¶120}** The State's conduct in this case is not emblematic of the spirit of the discovery rules. *See State v. Johnson*, 8th Dist. Cuyahoga No. 36580, 1977 WL

201612, *2 (Nov. 23, 1977) ("The prosecutor in this case did not comply with the spirit or language of the discovery rules. We condemn such a practice."); *State v. Kopatz*, 5th Dist. Stark No. CA-8293, 1991 WL 34876, *2 (Mar. 11, 1991) (concluding that the State's argument "that the request for discovery only wanted the names of witnesses to be called at trial" was "somewhat disingenuous, and contrary to the spirit if not the letter of the rules regarding discovery"). The record reflects that the State's response on December 22, 2016 to Frye's discovery demand documents that the State intended to call Patterson as a witness. (Doc. No. 11). Until the second day of trial, there is no evidence in the recording indicating that the State no longer intended to call Patterson as a witness. The State's intention not to call Patterson at trial was exposed only after the State asked Investigator Harrod about Patterson's criminal history. (May 23-25, 2017 Tr., Vol. II, at 270). After Frye objected, Frye informed the trial court that Patterson's criminal history was not provided in discovery. (*Id.* at 272-273). In response, the State asserted that it did not intend to call Patterson as a witness. (*Id.* at 273-274). The timing of the State's indication not to call Patterson gives the appearance of poor trial preparation, at best, or of being disingenuous. *Compare State v. Bowshier*, 2d Dist. Clark No. 2008 CA 101, 2009-Ohio-6387, ¶ 72 ("Although we find no abuse of discretion, we do not sanction the prosecutor's eleventh-hour recognition and disclosure of new evidence when that evidence could have been discovered and disclosed long before trial.");

*Toledo v. Drake*, 6th Dist. Lucas No. L-15-1152, 2015-Ohio-5497, ¶ 10 (stating that the discovery violation "appear[ed] to be an example of poor trial preparation on the part of the prosecutor" and not a willful failure). Indeed, the State represented to the trial court that it "just ran" Patterson's criminal history prior to the commencement of the second day of trial. (May 23-25, 2017 Tr., Vol. II, at 276). The better practice would have been to notify Frye of the State's amended witness list or to have provided Patterson's criminal history prior to trial—even if it did not intend to call Patterson as a witness but intended to introduce Patterson's criminal history as evidence. *See State v. Fouts*, 4th Dist. Washington No. 15CA25, 2016-Ohio-1104, ¶ 46 (noting that the failure to adhere to the rules of discovery "deprives the opposing party the opportunity to adequately prepare for trial").

{¶121} Nonetheless, the trial court exercised proper discretion in concluding that the State did not violate the rules of discovery while still ordering the State to provide Frye a copy of Patterson's criminal history. Indeed, the rule requires the provision of criminal records of state's witnesses; however, the rule does not explicitly state when provision of that record is required. Rather, the timeliness determinations are left to the discretion of the trial court. Moreover, Frye did not seek any additional remedy, such as a continuance. *See State v. Orsborne*, 3d Dist. Allen No. 1-06-94, 2007-Ohio-5776, ¶ 49 ("Orsborne's attorney did not request any continuances after reviewing the report nor did Orsborne's attorney request a

mistrial."). Further, the trial court permitted Frye to cross-examine Investigator Harrod regarding Patterson's criminal history. *See id.* ("The trial court gave the defense an opportunity to review the report, and the defense questioned [the witness] regarding the report.").

{¶122} Because the trial court did not abuse its discretion in concluding that the State did not violate the discovery rules, there is no error, let alone a reversible error. As such, Frye cannot demonstrate that his substantial rights were prejudicially affected or that the outcome of his trial would have been different. *Compare id.* (concluding that even though "the prosecution violated Crim.R. 16, the violation is not reversible error in this case because there is no indication that Orsborne was prejudiced."). *See Bowshier*, 2009-Ohio-6387, at ¶ 72 (concluding that "the late disclosure and admission of [the witness's] testimony resulted in an unfair trial"). *See also State v. Kopatz*, 5th Dist. Stark No. CA-8293, 1991 WL 34876, *3 (Mar. 11, 1991) ("The State's compliance with discovery was by no means exemplary, but this record simply does not demonstrate that appellant was unable to properly defend his case because of anything that occurred.").

{¶123} In addition, Frye takes issue with the State's use of Patterson's criminal record to elicit testimony from Investigator Harrod, which, according to Frye, misrepresented Patterson's criminal past. That is, Frye alleges that the State "intentionally and unconscionably created a false view to the jury that Cornelius

Patterson had no weapons disability and hence no motive, knowing full well that this suggestion was likely false." (Appellant's Brief at 29).

{¶124} The particular exchange that Frye points to as creating the improper inference is as follows:

| [The State]: | Okay. So, once investigators had completed their search and all the evidence was collected and secured you said you went to the Lima Police Department and briefly spoke with Cornelius Patterson as well as the defendant, Marlon, Frye; correct? |
|---|---|
| [Investigator Harrod]: | Yes, ma'am. |
| [The State]: | Okay. After speaking with Cornelius Patterson were you able to determine what he was doing at 1109 St. Johns Avenue? |
| [Investigator Harrod]: | He was on vacation from Mississippi – Natchez, Mississippi. He had been here for approximately two to three weeks. He was a long time friend of Marlon Frye's – all the way back to elementary school. |

[The State]: And after speaking with him did you run a check of his criminal history?

[Investigator Harrod]: I did.

[The State]: Anything that showed that he wasn't allowed –

(May 23-25, 2017 Tr., Vol. II, at 270). At that time, Frye objected. (*Id.*). After the trial court concluded that the State did not violate the rules of discovery and ordered the State to provide to Frye a copy of Patterson's criminal history, the State continued its direct examination of Investigator Harrod:

[The State]: Did your investigation reveal any legal reason why Cornelius Patterson couldn't have a firearm?

[Investigator Harrod]: No, ma'am.

(*Id.* at 279). Frye contends that this line of questioning constituted misconduct because it impermissibly permitted the jury to infer that Patterson did not have a criminal history that would have established a weapons disability, which would have supplied him motive to dispose of the gun. *Compare State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, ¶ 105 ("Alleging prosecutorial misconduct, Obermiller again argues that the state placed 'prejudicial innuendo' in the record during Natasha Branam's testimony about images found on a computer in the Schneiders' home."). "To demonstrate prejudice in this context, 'a defendant must

show that the improper remarks or questions were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred.'" *Id.*, quoting *State v. Collier*, 8th Dist. Cuyahoga No. 78960, 2001 WL 1243925, *5 (Oct. 18, 2001), citing *State v. Campbell*, 69 Ohio St.3d 38, 51 (1994).

**{¶125}** Even if we assume without deciding that the State's questions were improper, Frye cannot demonstrate that the State's questions were prejudicial or that the outcome of his trial would have been different. *See id.* at ¶ 106. *See also State v. Hayes*, 10th Dist. Franklin No. 02AP-938, 2003-Ohio-2194, ¶ 133. The trial court ordered the State to provide to Frye a copy of Patterson's criminal history and permitted Frye to cross-examine Investigator Harrod regarding Patterson's criminal history. *Compare Hayes* at ¶ 133 (concluding that Hayes could not demonstrate "the requisite prejudice resulting from [the State's] improper line of questioning" because "[i]n responding to the prosecution's line of questioning * * *, appellant was able to offer probative testimony on cross-examination"). Frye's cross-examination of Investigator Harrod informed the jury that Patterson has a "lengthy" criminal history. (May 23-25, 2017 Tr., Vol. II, at 298). Frye's cross-examination further revealed for the jury that Patterson's criminal history reflects that, although the disposition of the cases are unknown because they occurred in other states, Patterson was arrested for felony offenses that would have resulted in a weapons disability if he was convicted of those offenses. (*Id.* at 297-298). (*See also id.* at

322-325).  Investigator Harrod admitted that he did not research the results of those arrests.  (*Id.* at 298).  (*See also id.* at 323).  The jury was free to infer that Patterson was convicted of an offense that established a weapons disability and was free to infer that Patterson had motive to put the gun in the toilet.  Likewise, based on those inferences, the jury was free to accept or reject Frye's contention that Patterson put the gun in the toilet.  Accordingly, we reject Frye's argument.

**{¶126}** For these reasons, Frye presented no evidence that the result of his trial would have been different.  Frye's fifth assignment of error is overruled.

### Assignment of Error No. VIII

### The Trial Court erred by refusing to merge Counts I and II.

**{¶127}** In his eighth assignment of error, Frye argues that the trial court erred by failing to merge his having-weapons-while-under-disability and tampering-with-evidence convictions.

**{¶128}** Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo.  *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15, citing *State v. Brown*, 3d Dist. Allen No. 1-10-31, 2011-Ohio-1461, ¶ 36.

**{¶129}** R.C. 2941.25, Ohio's multiple-count statute, states:

(A)  Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the

-76-

indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B)  Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶130} The Supreme Court of Ohio directs us to apply a three-part test to determine whether a defendant can be convicted of multiple offenses:

"As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses:  (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?  An affirmative answer to any of the above will permit separate convictions.  The conduct, the animus, and the import must all be considered."

Case No. 1-17-30

*State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 12 and citing *Ruff* at paragraphs one, two, and three of the syllabus.

**{¶131}** Because it is dispositive, we will first address the separate-animus question of the tripart test. "The term 'animus' means "'purpose or, more properly, immediate motive."'" *State v. Ramey*, 2d Dist. Clark No. 2014-CA-127, 2015-Ohio-5389, ¶ 70, quoting *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 40, quoting *State v. Logan*, 60 Ohio St.2d 126, 131 (1979).[2] "'Where an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must * * * commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.'" *Id.*, quoting *Logan* at 131.

**{¶132}** "'Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances.'" *Id.* at ¶ 71, quoting *Logan* at 131. "'Thus the manner in which a defendant engages in a course of conduct may indicate distinct purposes.'" *Id.*, quoting *State v. Whipple*, 1st Dist. Hamilton No. C-110184, 2012-Ohio-2938, ¶ 38. "'Courts should consider what

---

[2] Although the "two-step" analysis prescribed by the Supreme Court of Ohio in *Logan* has been overruled, the court's discussion of animus remains relevant under the current tripart test prescribed in *Ruff*. *See, e.g.*, *State v. Lundy*, 8th Dist. Cuyahoga No. 105117, 2017-Ohio-9155, ¶ 26 ("Although *Logan* predates *Ruff*, Ohio courts continue to apply the guidelines set forth in *Logan* to determine whether * * * offenses were committed with a separate animus, in accordance with the third prong of the *Ruff* test.").

-78-

facts appear in the record that "distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed."'" *Id.*, quoting *Whipple* at ¶ 38, quoting *State v. Glenn*, 8th Dist. Cuyahoga No. 94425, 2012-Ohio-1530, ¶ 9.

**{¶133}** Other Ohio courts of appeal have concluded that having-weapons-while-under-disability and tampering-with-evidence convictions do not merge. *See State v. Lyons*, 7th Dist. Jefferson No. 16 JE 008, 2017-Ohio-4385, ¶ 42; *State v. Wilcox*, 2d Dist. Clark No. 2013-CA-94, 2014-Ohio-4954, ¶ 20. *See also State v. Ervin-Williams*, 8th Dist. Cuyahoga No. 2014-T-0009, 2014-Ohio-5473, ¶ 88, fn. 1 (noting "that having weapons while under disability and tampering with evidence have been found to not be allied offenses" under the pre-*Ruff* analysis), citing *State v. Thomas*, 8th Dist. Cuyahoga No. 94042, 2010-Ohio-5237, ¶ 28, fn. 4 (concluding that having-weapons-while-under-disability and tampering-with-evidence convictions did not merge under the pre-*Ruff* analysis requiring courts to compare the elements of offenses without reaching the second-prong of the test, which "considers whether there was a separate animus supporting each conviction"). The cornerstone of the analysis is whether the evidence reflects that an offender acquired a firearm "at some time prior" to concealing the firearm to impair its availability as evidence in a proceeding or investigation. *Compare Lyons* at ¶ 42 (concluding that "Lyons acquired and possessed a firearm at some time prior to the fight at the club"

and "he discarded the firearm while being chased by police; specifically, to conceal the firearm with the purpose to impair its availability as evidence"); *Wilcox* at ¶ 20 ("He committed the offense of having weapons while under disability when he (necessarily) acquired the gun before he got into the SUV * * * and the evidence the State presented in support of the tampering offense occurred when he hid the gun under the driver's seat."). *See State v. Petty*, 8th Dist. Cuyahoga No. 105222, 2017-Ohio-8732, ¶ 16 ("""[The] animus of having a weapon under disability is making a conscious choice to possess a weapon. [The defendant] necessarily acquired the guns sometime prior to committing the other crimes. The fact that he then used the weapons to commit the other crimes does not absolve [the defendant] of the criminal liability that arises solely from his decision to illegally possess the weapons."""), quoting *State v. Brown*, 8th Dist. Cuyahoga No. 102549, 2015-Ohio-4764, ¶ 12, quoting *State v. Cowan*, 8th Dist. Cuyahoga No. 97877, 2012-Ohio-5723, ¶ 39. *But see State v. Clark*, 2d Dist. Montgomery No. 27365, 2017-Ohio-7633, ¶ 31 ("We have said that to prove that the offenses of felonious assault and having weapons under disability merge, the defendant must show that he acquired the weapon with an immediate, virtually simultaneous intent to fire it at the victim and had no other reason for possessing the weapon."), citing *Grissom*, 2014-Ohio-857, at ¶ 44.

{¶134} Based on the evidence adduced at trial, we conclude that Frye did not commit the having-weapons-while-under-disability and tampering-with-evidence crimes with the same animus. In other words, there is *no* evidence in the record that Frye acquired the firearm with an immediate, virtually simultaneous intent to conceal it to impair its availability as evidence in an investigation. *Compare Clark* at ¶ 31. Rather, the record reflects that the firearm was in Frye's residence prior to law enforcement's entry. Indeed, law enforcement discovered a firearm holster in the cabinet in which law enforcement also discovered narcotics. For the same reasons we concluded in Frye's sixth and seventh assignments of error that he possessed the ADB Fubinaca, it is reasonable to conclude that Frye possessed the firearm. Specifically, it is reasonable to conclude that Frye possessed the firearm prior to intending to conceal it from law enforcement by placing it in the toilet. Accordingly, we conclude Frye necessarily acquired the firearm prior to law enforcement's entry into his residence and prior to the time he intended to conceal it from law enforcement by placing it in the toilet. Therefore, Frye committed the offenses with separate animus. *See Lyons* at ¶ 42; *Wilcox* at ¶ 20. Because "we may end our analysis upon an affirmative response to any of the three [*Ruff*] questions[,]" we need not address whether the offenses are of dissimilar import or whether Frye committed the offenses separately. *State v. Bailey*, 1st Dist. Hamilton No. C-

140129, 2015-Ohio-2997, ¶ 83. As such, the trial court correctly concluded that the offenses do not merge.

{¶135} Frye's eighth assignment of error is overruled.

{¶136} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ZIMMERMAN, J., concurs.**

**SHAW, J., concurs in Judgment Only.**

**/jlr**